No. 59,782

INTERFIRST BANK GREENSPOINT, A TEXAS STATE BANK ORGANIZATION, *Plaintiff/Appellee,* v. FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF BELOIT, *Defendant/Third-Party Plaintiff/Appellant,* v. PAUL J. CHAINEY and WALTER J. KASSUBA, *Third-Party Defendants.*

(747 P.2d 129)

Opinion filed December 11, 1987.

*James Howard,* of Morrison, Hecker, Curtis, Kuder & Parrish, of Overland Park, argued the cause, and *R. Kent Sullivan,* of the same firm, *Nancy L. Shelledy,* of the same firm, of Kansas City, Missouri, *Howard S. Levitan* and *Lawrence D. Flick,* of The Howard S. Levitan Professional Association, of Prairie Village, and *Harry W. Gantenbein* and *Guy R. Steier,* of Gantenbein & Frasier, of Beloit, were on the briefs for the appellant.

*J. Stan Sexton,* of Hampton, Royce, Engleman & Nelson, of Salina, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

MILLER, J.: This is an appeal by First Federal Savings & Loan Association of Beloit (First Federal) from a summary judgment granted against it and in favor of InterFirst Bank Greenspoint, of Houston, Texas, (InterFirst) based upon First Federal's dishonor of its letters of credit, and also from a summary judgment entered in favor of InterFirst on First Federal's counterclaim alleging impairment of collateral. This case comes before us by transfer from the Court of Appeals. First Federal contends that the motion for summary judgment was not timely served; there were fact issues precluding the entry of summary judgment; the drafts issued upon the letters of credit were not in strict compliance with the terms of the letters; InterFirst made an election of remedies by filing a direct action in a Texas court; and InterFirst improperly released some 209,000 shares of Fuddruckers common stock held as collateral for the underlying loans, to the prejudice of First Federal.

The facts are complicated, and must be set out in some detail. First Federal, a Beloit, Kansas, savings and loan association, issued its Irrevocable Transferable Letter of Credit in the amount of $300,000, being No. 019, to InterFirst, a Texas state bank, on July 26, 1983. The letter was directed to InterFirst Bank Greenspoint, and reads in part as follows:

"Gentlemen:

"We hereby establish our Irrevocable Transferable Letter of Credit # 019 in your favor at the request and for the account of Paul J. Chainey, Jr. and W. J. Kassuba personally at 12700 Northborough Drive, Suite 222, Houston, Texas, 77067, for a sum not exceeding in all U.S. dollars Three Hundred Thousand and no/100 (U.S. $300,000) available by your sight draft drawn on us and accompanied by a statement signed by an officer of InterFirst Bank—Greenspoint or its transferee or assignee which states that Paul J. Chainey, Jr. and W. J. Kassuba have not performed satisfactorily under the terms of a contract or obligation to that financial institution.

. . . .

"All drafts so drawn must be marked 'Drawn Under First Federal Savings and Loan Association of Beloit, Kansas, Letter of Credit No.019 dated July 26, 1983.'

. . . .

"The original of the Letter of Credit must accompany all drawing.

"We hereby engage with you that all drafts drawn under and in compliance with the terms of this credit will be duly honored by us."

InterFirst, on July 29, 1983, loaned $300,000 to Paul J.

Chainey, Jr., and Walter J. Kassuba. The loan was secured by the letter of credit. Kassuba is not a party to this lawsuit as he was not successfully served in Kansas. A second Irrevocable Transferable Letter of Credit was similarly issued by First Federal to InterFirst in the amount of $100,000, being No. 022, on October 20, 1983. Once again, InterFirst loaned Chainey and Kassuba $100,000 which was secured by letter of credit No. 022.

Chainey and Kassuba did not pay InterFirst; InterFirst demanded payment on the letters of credit; First Federal refused to honor the letters of credit. This action followed.

First Federal was a federally chartered savings and loan association, and the majority of its stock was owned by First Kansas Holding Company (Holding Company). First Federal owned a subsidiary, First Kansas Service Corporation (Service Corp.), which maintained offices in Houston, Texas, and was involved in the mortgage brokerage service.

In March 1983, Chainey was employed as executive vice-president and managing officer of Service Corp., and he was so employed at the time the first letter of credit was issued. In September of 1983, he became vice-president of First Federal, and he resigned that position on September 24, 1984. He owned a 50% interest in the Holding Company, which in turn held 63% of the stock in First Federal. During this time, Chainey owed to First Federal $325,000, which debt was secured by a mortgage. Chainey, together with three other persons, Kassuba, Neil Niewald, and Cameron Douthitt, organized Texas Mortgage Resources (TMR). Chainey was an officer, director, and 25% owner of TMR, which was in the secondary mortgage brokerage business in Houston. TMR operated out of the same office as Service Corp., which was also in the mortgage brokerage business.

Neil Niewald was the president and managing officer and a director of First Federal until September 24, 1984. He also owned stock in the Holding Company which held 63% of the stock of First Federal, and he was one of the organizers, officers, and directors and a 25% owner of TMR. As president of First Federal, he issued both of the letters of credit described above.

The purpose of the loans from InterFirst to Chainey and Kassuba, secured by the letters of credit, was to provide working capital for TMR. Jerry Clark, a senior vice-president of Inter-

First, made the loans. He was provided with the financial statements of both Chainey and Kassuba. Chainey's financial statement revealed he was executive vice-president of Service Corp., as well as 50% owner of the Holding Company which held 63% of the stock of First Federal. Although Chainey and Kassuba executed their notes to InterFirst personally, and TMR was not a signatory thereof, Clark knew the purpose of the loans and knew that they were to be repaid by TMR. Before making the loans, Clark called First Federal and spoke with the controller. The purpose of the call was to obtain a detailed financial statement from First Federal. Clark told the controller that his need for the financial statement of First Federal was related to a letter of credit to be issued by First Federal to InterFirst to secure Chainey's indebtedness.

InterFirst made yet a third loan to Chainey and Kassuba on March 15, 1984, in the amount of $250,000. These funds were used to purchase a time certificate of deposit for TMR to satisfy Federal National Mortgage Association requirements. A promissory note for the $250,000 was executed by Chainey and Kassuba. That note was not secured by a new letter of credit, but by the two earlier letters by cross-collateralization. Both the loan application and the security agreement stated that the collateral to secure the loan would be 45,000 shares of Fuddruckers stock. The loan application recited: "We don't have and will not have stock cert.'s." Chainey gave InterFirst a Voting Trust Certificate No. 17, dated February 20, 1984, for 209,905 shares of Fuddruckers stock. Chainey further executed in blank an irrevocable stock power and a Federal Reserve Form U-1, which set forth the security interest in 45,000 shares of Fuddruckers stock. Inter-First notified the trustee of the Voting Trust of its possession of the Voting Trust Certificate, and a few days later by separate letter asked that the trustee accept the letter as InterFirst's notification of assignment of 45,000 shares of Fuddruckers, Inc., common stock by Paul Chainey, Jr. The trustee of the Voting Trust acknowledged in writing the assignment of 45,000 shares of Fuddruckers stock to InterFirst. When the original loans of $300,000 and $100,000 simultaneously matured, a new loan application was submitted and approved, and a new promissory note for $400,000 was executed by Chainey and Kassuba. The

letters of credit were given as collateral for the renewed loan. The new note required monthly interest payments and quarterly principal payments. The $250,000 note matured: Chainey and Kassuba made a $25,000 principal reduction, and the note was renewed in the amount of $225,000. There was no change in collateral for the renewal note.

Only interest was paid on the $225,000 note, making it current up to November 15, 1984. On the $400,000 note, a principal payment of $20,000 was made and interest was paid to October 15, 1985. Nothing further was paid on the notes.

On January 25, 1985, sight drafts, letters, and the original letters of credit were prepared by InterFirst for presentation to First Federal. On January 28, 1985, First Federal acknowledged receipt of the same. A signed statement by a vice-president of InterFirst, accompanying the sight drafts, recited that Chainey and Kassuba had "not performed satisfactorily under the terms of a contract or obligation to InterFirst." Also on January 28, 1985, InterFirst made demand upon Chainey and Kassuba for payment on the $400,000 and the $225,000 notes. On February 25, 1985, InterFirst commenced this action in the District Court of Mitchell County, Kansas. On April 24, 1985, InterFirst filed an action against both Chainey and Kassuba in the District Court of Harris County, Texas, seeking recovery on the two outstanding promissory notes. In September 1985, InterFirst sold the 45,000 shares of Fuddruckers stock for $275,000. The $225,000 note plus accrued interest was paid, and the balance of over $25,000 was placed in a certificate of deposit. When it matured, the principal and interest were applied to the $400,000 note.

The first issue concerns the timeliness of the motion for summary judgment. First Federal contends that notice was not received ten days before the motion was set for hearing as required by K.S.A. 1986 Supp. 60-256(c). The records disclose that in November 1985, InterFirst filed a motion for summary judgment. That motion was denied, but the trial court stated that the issues presented in the motion for summary judgment "may be re-presented or re-instituted at the Pretrial Conference." A second motion for summary judgment was filed by InterFirst on June 5, 1986, and noticed for hearing at the pretrial conference on June 12. The second motion contained the same request for

judgment on the letters of credit, on the same grounds urged in the earlier motion, and additionally sought summary judgment on First Federal's counterclaim against InterFirst for alleged impairment of collateral. The motions were argued fully at the pretrial conference. The trial judge did not rule at that time, but allowed both parties to file supplemental memoranda. There was no request for additional or later oral argument. Upon receipt of the supplemental memoranda from counsel, the trial judge entered summary judgment for InterFirst, both on its principal claim against First Federal for dishonor of the two letters of credit, and on First Federal's counterclaim alleging impairment of collateral. As to the first portion of the motion for summary judgment, First Federal had some six months' notice of that claim by InterFirst. First Federal was also aware that the matter could be raised at the pretrial conference. We have held that even when such a motion is renewed orally at pretrial conference, the trial court may rule upon it. *Powell v. City of Haysville*, 203 Kan. 543, 545, 455 P.2d 528 (1969).

With regard to the other portion of the motion, counsel for First Federal participated fully in the argument on the motion and later submitted a memorandum in support of First Federal's position. We have defined harmless error as that which does not prejudice the substantial rights of a party. *Hagedorn v. Stormont-Vail Regional Med. Center*, 238 Kan. 691, 701, 715 P.2d 2 (1986) (citing *City of Ottawa v. Heathman*, 236 Kan. 417, 426, 690 P.2d 1375 [1984]). While there may have been procedural error with regard to the notice given on the second part of the motion for summary judgment, First Federal's counsel made no objection to proceeding with oral argument on the same, and the trial court afforded counsel an adequate opportunity to brief the matter and submit additional memoranda, which was done. The error was harmless, and forms no basis for a reversal.

Next, First Federal contends that there was fraud in the transaction, and an allegation of fraud raises a question of fact for the jury. As we said in *Nordstrom v. Miller*, 227 Kan. 59, Syl. ¶ 9, 605 P.2d 545 (1980), "The existence of fraud is ordinarily a question of fact." And see *Augusta Bank & Trust v. Broomfield*, 231 Kan. 52, 64, 643 P.2d 100 (1982).

The gist of First Federal's argument is that, when InterFirst

made the loan, its loan officer had before him sufficient information to put InterFirst on notice that Chainey had substantial interest in both TMR, First Federal, and the Holding Company. Furthermore, First Federal contends that in view of the statutory limits imposed upon financial institutions on loans to officers, InterFirst should have investigated the authority of Niewald, the president of First Federal, to issue the letters of credit. We do not agree. The loan officer called the controller of First Federal before making the loan, thus putting First Federal on notice that InterFirst was expecting letters of credit to secure a loan to Chainey. The facts upon which First Federal relies simply disclosed to InterFirst's loan officer that Chainey had an interest in various financial corporations and apparently was financially solvent. The fraud was obviously that of First Federal's officers. We find nothing in the record which indicates that InterFirst was put on notice of the fraud being committed by the officers of First Federal and its subsidiary, Service Corp. Further, "fraud in the transaction," as that phrase is used in K.S.A. 1986 Supp. 84-5-114(2), must stem from the conduct of the beneficiary against the customer, not by the customer against the issuer of the letter of credit. See White & Summers, Uniform Commercial Code § 18-6 (2d ed. 1980).

Here, there was no fraudulent conduct by InterFirst, the beneficiary of the letters, against the customer, Chainey, nor was there any fraudulent conduct by InterFirst as against First Federal. The purpose of a letter of credit is to allow the beneficiary to rely thereon, rather than solely upon the credit of the customer. The exception to the issuer's duty to honor letters of credit has been narrowly construed by the courts. See *New York Life Ins. Co. v. Hartford National Bank & Trust Co.*, 173 Conn. 492, 378 A.2d 562 (1977); *First Arlington Nat'l Bk. v. Stathis*, 90 Ill. App. 3d 802, 413 N.E.2d 1288 (1980); *O'Grady v. Bank*, 296 N.C. 212, 250 S.E.2d 587 (1978). Fraud in this connection is defined in an annotation in 25 A.L.R.4th 239, 247 as of "such an egregious nature as to vitiate the entire transaction."

First Federal bases its claim of fraud upon InterFirst's duty to investigate further. The information provided to InterFirst by Chainey's financial statement was scant and sketchy indeed, compared to the actual information possessed by First Federal at

the same time. We find no duty upon InterFirst to make further investigation at the time it accepted the letters of credit and made the loans. Summary judgment was properly entered on this issue.

Next, First Federal argues that summary judgment was improperly entered on the issue of lack of authority of Niewald, its president, to issue the letters of credit. First Federal contends that InterFirst's knowledge of the same facts relied upon in the point last discussed impaired its ability to rely on Niewald's apparent authority to issue the letters of credit. We do not agree. Further, First Federal disputes Niewald's authority, contending that under the bylaws he was required to secure approval from the board of directors before issuing letters of credit. However, First Federal ratified Niewald's action in two ways, thus making the issues of knowledge and apparent authority moot. First Federal was notified by the Federal Home Loan Bank of the issuance of the letters of credit in early September 1984. After obtaining such knowledge, First Federal failed to notify Inter-First or complain of any wrongdoing or unauthorized act by Niewald. There was no repudiation of Niewald's issuance of the letters of credit, once the issuance became known to First Federal's board. We have held that, upon acquiring knowledge of an agent's unauthorized act, the principal should promptly repudiate the act, otherwise the act will be presumed ratified and affirmed by the principal. See *Schraft v. Leis*, 236 Kan. 28, 37, 686 P.2d 865 (1984), and authorities there cited. By failing to object to Niewald's issuance of the letters of credit, First Federal effectively ratified the allegedly unauthorized act. First Federal further ratified Niewald's acts by executing an escrow agreement with Kassuba on November 13, 1984, wherein First Federal agreed to "honor the Letters of Credit with InterFirst Bank Greenspoint, Houston, Texas, or its successors."

We have frequently held that an unauthorized act of an agent may be ratified by a principal, and when ratified is the equivalent of an original grant of authority. *Osborn v. Grego*, 226 Kan. 212, 216, 596 P.2d 1233 (1979); and see cases there cited.

First Federal admitted that Niewald had apparent authority to issue the letters of credit. The admission was later retracted and it was contended by First Federal that while Niewald had

apparent authority to issue letters of credit on behalf of a customer, that apparent authority would not be apparent to an officer of another bank. Again, First Federal seeks to raise the "knowledge" of InterFirst, disclosed by the financial statement given by Chainey at the time he sought the original loan. We hold that this financial statement did not raise any red flags which would require InterFirst to investigate the authority of Niewald, as president of First Federal, to issue the letters of credit. Niewald was unknown to InterFirst, and it had no reason or duty to question his authority. We hold that summary judgment was properly entered on this issue.

First Federal next contends that the drafts were not in strict compliance with the terms of the letters of credit. K.S.A. 1986 Supp. 84-5-114(1) and (2) allow an issuer to dishonor drafts that are not in compliance with the letter of credit. First Federal claims that the drafts were presented for payment in the sum of $400,000 while only $380,000 was due on the promissory notes secured by the letters of credit. Additionally, First Federal contends that when the drafts were presented, it had not been established that Chainey and Kassuba had not "performed satisfactorily" on their notes to InterFirst. The trial court found no fraud on the part of InterFirst and concluded that the documents presented were in substantial compliance with the letters of credit.

While only $380,000 principal was due on the $400,000 note, over $14,000 in interest had accrued at the time InterFirst presented the letters of credit to First Federal for payment. Additionally, the letters of credit were secondary collateral for the $225,000 loan. Chainey and Kassuba were in substantial default on all of these obligations to InterFirst at the time InterFirst processed its draft and demanded payment from First Federal. Accompanying the draft was a statement from a vice-president of InterFirst stating that Chainey and Kassuba "have not performed satisfactorily under the terms of a contract or obligation to InterFirst Bank Greenspoint, Houston, Texas". We need not here decide whether the standard for demands on payment of letters of credit should be strict compliance or substantial compliance. We hold that the drafts and documents submitted by InterFirst strictly complied with the terms of the letters of credit. This issue has no merit.

First Federal contends that InterFirst made an election of remedies, after this case was pending, by filing a separate and direct action against Chainey and Kassuba in Texas. First Federal relies upon *Griffith v. Stout Remodeling, Inc.,* 219 Kan. 408, 411-12, 548 P.2d 1238 (1976), where we said:

"The doctrine of election of remedies is an application of one phase of the law of estoppel which prevents one who comes into court, asserting or defending his rights, from taking and occupying inconsistent positions. . . . The test of inconsistency of remedies is a factual and logical one. To make actions inconsistent one action must allege what the other denies, or the allegation in one must necessarily repudiate or be repugnant to the other."

InterFirst, prior to commencing this action, served First Federal with a draft and several attached documents, including an affidavit of its vice-president stating that Chainey and Kassuba "had not performed satisfactorily under the terms of a contract or obligation to InterFirst." InterFirst is bringing this action to enforce the letters of credit for the simple reason that Chainey and Kassuba did not pay according to the terms of their notes with InterFirst. Similarly, it brought an action in Texas, seeking judgment against Chainey and Kassuba, contending that Chainey and Kassuba did not pay according to the terms of their notes and obligations to InterFirst. We see nothing inconsistent or repugnant between these two actions. InterFirst is simply attempting to recover the proceeds of a bad loan, plus the accrued interest thereon. It matters not whether that sum is paid by First Federal on the letters of credit which were security for the loan, or whether the sum is paid by Chainey and Kassuba. Once InterFirst has been fully paid, in either action, then the other case should be dismissed. Payment, however, has not occurred. We find no inconsistency in the actions.

Finally, First Federal contends that InterFirst improperly released 209,905 shares of Fuddruckers stock which it held as collateral for the underlying loans, thus impairing First Federal's rights in that collateral. The facts, however, do not support this contention. Chainey executed a written security agreement to InterFirst, specifically giving InterFirst a security interest in 45,000 shares of Fuddruckers stock. The same document indicated that the stock was not certificated. Chainey at that time

gave InterFirst a Voting Trust Certificate, showing Chainey's ownership interest in 209,905 shares of Fuddruckers common stock. InterFirst recorded the receipt of the Voting Trust Certificate in its collateral register to show 45,000 shares of stock were held to secure indebtedness. The trustee of the Voting Trust confirmed the assignment of 45,000 shares. Simultaneously with the creation of the security interest, InterFirst perfected its security interest in 45,000 shares.

The Voting Trust stock was uncertificated. Chainey did not place in InterFirst's hands stock certificates for 209,905 shares of Fuddruckers stock; Chainey simply provided a document indicating his ownership of that many shares of stock at the time he specifically gave InterFirst a security agreement in 45,000 of those shares. InterFirst subsequently sold the 45,000 shares and returned the Voting Trust Certificate for 209,905 shares to Chainey, since it had no interest beyond the 45,000 shares.

We see no reason to go into a lengthy discussion of the provisions of the Uniform Commercial Code, and to determine whether Texas law or Kansas law applies. Both states have adopted the Uniform Commercial Code, and the outcome is the same under the statutes of either state. Simply put, InterFirst had no interest beyond the 45,000 shares, and its return of the Voting Trust Certificate to Chainey did not impair the collateral available either to it, or to First Federal, in the only property which was subject to the security agreement, 45,000 shares.

We conclude that the judgment of the District Court of Mitchell County was correct, and it is affirmed.