GROUND AIR TRANSFER, INC. d/b/a
Charter One, Plaintiff, Appellee,

v.

WESTATES AIRLINES, INC. and Jesse
Yohanan, Defendants, Appellants.

No. 89–2082.

United States Court of Appeals,
First Circuit.

Heard Jan. 11, 1990.

Decided March 30, 1990.

David M. Jones with whom McDermott &
Rizzo, Boston, Mass., Marianne C. Rossi,
Los Banos, Cal., and George P. Eshoo and
Assoc., Redwood City, Cal., were on brief,
for defendants, appellants.

Mark S. Kahan with whom Mark T.
Priesing, Galland, Kharasch, Morse & Gar-
finkle, P.C., Washington, D.C., Kevin
McGee and Seder & Chandler, Worcester,
Mass., were on brief, for plaintiff, appellee.

Before BREYER, ALDRICH and
TORRUELLA, Circuit Judges.

BREYER, Circuit Judge.

The two parties before us—Westates and
Charter One—signed a "charter air ser-
vice" contract. As the contract required,
Charter One arranged for a bank to issue a
$50,000 "standby" letter of credit in Wes-
tates' favor, a letter designed, in part, to
make certain Westates would not suffer
harm should Charter One fail to carry out
its contractual obligations. *See generally
Itek Corp. v. First National Bank of Bos-
ton,* 730 F.2d 19, 24 (1st Cir.1984) (explain-
ing the purpose of the standby credit); J.
Dolan, *The Law of Letters of Credit* ¶ 1.04,
at 1–12 to 1–15 (1984 & Supp.1989) (same).
Subsequently, a dispute arose; each party
claimed the other broke the contract.

Westates, the beneficiary of the letter of
credit, would now like to "call" the letter,
thereby obtaining the $50,000, which it
hopes to keep, at least while the courts
litigate the parties' various "breach of con-
tract" claims. The federal district court,
however, has issued an injunction, forbid-
ding Westates to call the letter of credit.

Westates appeals from the issuance of
the injunction. It says that the law prohib-
its a court from enjoining a call on a stand-

by letter of credit, at least in a typical case, where the beneficiary's position in the underlying contract dispute is colorable and where the beneficiary can satisfy the terms that the letter of credit itself sets forth as conditions for its call. *See, e.g., Trans Meridian Trading, Inc. v. Empresa Nacional de Comercializacion de Insumos,* 829 F.2d 949, 956 (9th Cir.1987); *Itek,* 730 F.2d at 24–25; *Intraworld Indus., Inc. v. Girard Trust Bank,* 461 Pa. 343, 336 A.2d 316, 325 (1975); *Dynamics Corp. of America v. Citizens & Southern National Bank,* 356 F.Supp. 991, 999 (N.D.Ga.1973). We agree with Westates that the record before us indicates that this case presents the typical commercial circumstances (in respect to the underlying contract, the dispute, and the letter of credit), in which commercial law, as embodied in the Uniform Commercial Code, prohibits an injunction. Charter One argues that California law (which governs this dispute) is different; it reads an intermediate state appellate court decision as permitting an injunction. *See Steinmeyer v. Warner Consolidated Corp.,* 42 Cal.App.3d 515, 116 Cal. Rptr. 57 (Cal.Ct.App.1974). We do not believe, however, that *Steinmeyer* creates what would amount to an unusual exception to the "no injunction" rule. Alternatively, if *Steinmeyer* means to create such an exception, we do not believe the California Supreme Court would follow it. Consequently, we reverse the district court.

## I. *Background*

We set forth several background circumstances so that the reader can see that this case (as far as the record here reveals) is one in which commercial law normally would prohibit an injunction. That is to say, the underlying contract is a simple, typical commercial contract; Westates' claim that Charter One broke the contract is at least "colorable;" and Westates seems able to satisfy the terms that the letter of credit itself sets forth as conditions for its call.

1. *The contract.* Westates provides airplanes and related services for charter flights. Charter One sells charter flights to travelers. In mid–1989 Westates and Charter One signed a contract under which Westates promised to provide planes and crews for Charter One's new service between Providence, Rhode Island, and Atlantic City, New Jersey, and also (by later amendment to the contract) for its new service between Worcester, Massachusetts, and Atlantic City. The contract required Charter One to pay Westates each month a fee calculated on the basis of the number of hours flown, with a minimum fee of about $105,000 (based on 70 hours flown), which was increased to about $209,000 (150 hours flown) when the Worcester service was added. The contract contained a special "default" clause, which says,

> upon any default by Charter One as defined in this agreement, Westates may immediately terminate all service.... Westates shall immediately notify Charter One of the default.... If the default is not cured by Charter One within ten (10) days from the date of mailing the *notice of default,* Westates shall have the right to immediately declare Charter One's default to be a material breach of this agreement and declare this agreement to be terminated without further notice to Charter One.

(Emphasis added.) The contract also required speedy transmission of each monthly payment. It said that late payment was "considered a default."

2. *The contract dispute.* Each party now says that the other party broke this contract. The record reveals a dispute that began in August 1989, when the contract was less than one month old. Charter One's president says that Westates' owner called him and threatened to cancel the contract unless Charter One would pay a higher minimum fee. Charter One refused. Westates then sent Charter One a "ten day default" notice, under the contract's special "default" provision. The "ten day notice" said that Westates would not provide planes for Charter One's Worcester/Atlantic City service after September 4. Westates, even before September 4, provided only one plane, rather than two planes (as the contract required), but Westates says

that maintenance problems, not contract-cancellation efforts, were responsible.

Subsequently, Westates, apparently under pressure from Charter One, changed its mind about cancelling the contract. Charter One's attorney wrote to Westates suggesting that "Westates reconsider its decision to cancel the contract and instead perform its obligations as required." The letter adds:

Please advise the undersigned by close of business on Wednesday, August 30, 1989, whether Westates intends ... cancellation of the Worcester program. If we do not hear from [you] ... by that time, we will assume that Westates does not intend to abide by its contract, and Charter One will take such measures as are necessary to protect its rights.

On August 30 a Westates attorney, in California, called Charter One's attorney, in Washington, D.C. She says that she told Charter One that Westates indeed intended to abide by the contract and that it rescinded its cancellation. She did not call, however, until 3 p.m. California time, which was 6 p.m. Washington, D.C., time. Charter One then decided that it would not go through with the contract; and it wrote back to Westates that Westates' call had come "too late" (apparently meaning that the call had arrived after "close of business"). The letter added that Charter One would therefore "reject your verbal offer to rescind cancellation of the Worcester program...."

Westates then stopped providing Worcester/Atlantic City service. It continued, however, to provide Providence/Atlantic City service. In mid-September Charter One withheld about $32,000 from the monthly fees due Westates for that Providence service. Westates said that the contract did not permit Charter One to withhold this money. On September 22 it sent Charter One another "ten day default" notice. After ten days it cancelled the contract.

The parties have not yet litigated the merits of their contract disputes. We therefore need not decide whether Westates did, or did not, break the contract in mid-August, or whether it successfully reinstated the contract on August 30, or whether, irrespective of the status of the Worcester/Atlantic City portion of the contract, the Providence/Atlantic City portion remained in effect, or whether Charter One did, or did not, have the right to withhold $32,000 in mid-September. We need only decide that the record, so far, indicates that Westates' position, in respect to the contract dispute, is not *obviously* without merit, that its position is "colorable," and that, in arguing that it was entitled to receive the $32,000 and (not having received the money) to send a "ten day default" letter, Westates is not acting "fraudulently."

3. *The letter of credit.* The letter of credit here at issue is a typical, commercial letter designed to guarantee a beneficiary against harm caused by a contractual "default." The air service contract described above requires Charter One to arrange for a "letter of credit" as a "default guarantee." It says specifically in the section dealing with "default" that

Charter One must provide Westates with a Irrevocable Letter of Credit acceptable to Westates in the amount of $50,000....

It adds that:

Upon termination of the agreement by Westates ... it is agreed that Westates may take the irrevocable Letter of Credit as liquidated damages for the breach of this agreement by Charter One.

Charter One arranged for a Michigan bank to issue the letter. The letter itself says that Westates may "call" the letter and obtain the money by asking the bank for the money and providing the bank with a copy of the ten day default notice. It reads:

the credit amount is available to you [Westates] by your drafts on us at sight accompanied by: Dated notarized copy of the ten (10) day notice described in [the Westates/Charter One contract].

The record indicates that Westates can easily meet the terms in this letter of credit. It can provide the bank with a draft and with the "dated notarized copy of the ten ... day notice" that it sent to Charter One on September 22.

## II. *Ordinary Principles of Commercial Law*

As we have previously explained, parties to commercial contracts often arrange for "standby" or "guarantee" letters of credit. The beneficiary of such a letter typically wants to make certain that, if the other party to the contract defaults, the beneficiary can gain access to a secure fund of money which he can use, say, to satisfy the other party's debt to him (if he is a "seller"), or to purchase a substitute performance (if he is a "buyer"). He may also wish to make certain that, should any contractual dispute arise, it will "wend [its] way towards resolution with the money in [his] pocket, rather than in the pocket" of his adversary. *Itek*, 730 F.2d at 24. In order to permit the parties to agree to achieve these objectives, courts have typically considered the letter of credit as "independent" of the contract. That is to say, they have considered it a separate agreement with, say, the issuing bank, that permits the beneficiary to present the documents that satisfy the "call" conditions, and that requires the bank to honor the letter when the beneficiary does so. *See, e.g., Emery–Waterhouse Co. v. Rhode Island Hospital Trust National Bank*, 757 F.2d 399, 404 (1st Cir.1985); *Philadelphia Gear Corp. v. Central Bank*, 717 F.2d 230, 235–36 (5th Cir.1983); *Pringle–Associated Mortgage Corp. v. Southern National Bank*, 571 F.2d 871, 874 (5th Cir.1978); *Venizelos, S.A. v. Chase Manhattan Bank*, 425 F.2d 461, 464–65 (2d Cir.1970); *New York Life Insurance Co. v. Hartford National Bank & Trust Co.*, 173 Conn. 492, 378 A.2d 562, 567 (1977); *InterFirst Bank Greenspoint v. First Federal Savings & Loan Ass'n of Beloit*, 242 Kan. 181, 747 P.2d 129, 134 (1987); *Intraworld Industries, Inc.*, 336 A.2d at 323–24; *see also* U.C.C. § 5–114, comment 1 ("The letter of credit is essentially a contract between the issuer and the beneficiary and is recognized by this Article as independent of the underlying contract between the customer and the beneficiary."). Whether in satisfying those conditions—say, as here, by presenting a draft and a copy of a ten day notice—the beneficiary is, or is not, violating the terms of some other document, such as an underlying contract, is normally beside the point, for to prevent the beneficiary from obtaining the money while the court decides the "underlying contract" question may deprive the beneficiary of the very benefit for which he bargained, namely that any such underlying contract dispute will be "resolved while he is in possession of the money." *Itek*, 730 F.2d at 24; *see KMW International v. Chase Manhattan Bank N.A.*, 606 F.2d 10, 15 (2d Cir. 1979); J. Dolan, *supra* p. 2, ¶ 3.07[4], at 3–26 to 3–28. That is why the Uniform Commercial Code explicitly states that an "issuer must honor a ... demand for payment which complies with the terms of the relevant contract regardless of whether the ... documents conform to the underlying contract ... between the customer and the beneficiary." U.C.C. § 5–114(1), Cal.Com. Code § 5114(1) (West 1989). And, that is why the U.C.C. narrowly circumscribes the circumstances under which a court can enjoin the issuer from making such a payment. *See* U.C.C. § 5–114(2). Courts have also proved about as reluctant to issue injunctions against beneficiaries calling, as against issuers paying, letters of credit. *See, e.g., Harris Corp. v. National Iranian Radio & Television*, 691 F.2d 1344, 1353–55 (11th Cir.1982); *Shaffer v. Brooklyn Park Garden Apartments*, 311 Minn. 452, 250 N.W.2d 172, 176 (1977); J. Dolan, *supra* p. 2, ¶ 7.04[4][f], at 7–51 n. 170 (citing cases). Given the policy reasons against enjoining payment, the random happenstance as to whether beneficiary or issuer is within the court's jurisdiction, and the practical fact that, in any such case, the real parties in interest are likely the contracting parties (with issuing bank as neutral observer), the roughly parallel reluctance to enjoin both issuer and beneficiary is understandable. *See id.* at 7–50 to 7–52.

■ We have said throughout that courts may not *"normally"* issue an injunction because of an important exception to the general "no injunction" rule. The exception, as we also explained in *Itek*, 730 F.2d at 24–25, concerns "fraud" so serious as to make it obviously pointless and unjust

to permit the beneficiary to obtain the money. Where the circumstances *"plainly"* show that the underlying contract forbids the beneficiary to call a letter of credit, *Itek*, 730 F.2d at 24; where they show that the contract deprives the beneficiary of even a *"colorable"* right to do so, *id.* at 25; where the contract and circumstances reveal that the beneficiary's demand for payment has "absolutely no basis in fact," *id.; see Dynamics Corp. of America*, 356 F.Supp. at 999; where the beneficiary's conduct has " ' ' "so vitiated the entire transaction that the legitimate purposes of the independence of the issuer's obligation would no longer be served," ' " *Itek*, 730 F.2d at 25 (quoting *Roman Ceramics Corp. v. Peoples National Bank*, 714 F.2d 1207, 1212 n. 12, 1215 (3d Cir.1983) (quoting *Intraworld Industries, Inc.*, 336 A.2d at 324–25)); *then* a court may enjoin payment. The Uniform Commercial Code, as adopted in most states, says:

> Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document ... is forged or fraudulent or there is fraud in the transaction:
>
> . . . .
>
> (b) [except in certain circumstances listed in subsection (a) not here applicable] an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the documents *but a court of appropriate jurisdiction may enjoin such honor.*

U.C.C. 5–114(2) (emphasis added).

█ The "fraud" exception does not apply in this case, however, for the record shows nothing "fraudulent" about Westates' demand for payment, nor did the district court find to the contrary. As our earlier discussion of the contract dispute makes clear, *see* pp. 1270–71 *supra*, the record reveals that Westates' claims and defenses are, at the least, "colorable."

Since the letter of credit at issue is an ordinary "standby" or "guarantee" letter, since Westates can readily fulfill the letter's expressed "call" conditions, and since, in doing so, Westates' call would not amount to "fraud," commercial law, as embodied in the law of most states, would forbid a court to enjoin Westates from calling the letter, whether or not that court believed that eventually Westates would lose its case on the underlying contract. *See* cases cited at p. 1272 *supra*. The only remaining question on this appeal is whether California's law significantly deviates from the norm.

### III.  *California Law*

California letter of credit law quite obviously differs from the norm in one important respect, but in a respect that must make a court more reluctant, not less reluctant, to issue an injunction. When California adopted the Uniform Commercial Code, it consciously refused to adopt the language permitting an injunction that we italicized when we quoted U.C.C. 5–114(2) at p. 1273, *supra*. By omitting this language, California underscored the principle of the "independence" of the letter of credit. The California Code's drafters explicitly stated that the U.C.C.'s "provision for a protective injunction was omitted because: 'By giving the courts power to enjoin the honor of drafts drawn upon documents which appear to be regular on their face, the Commissioners on Uniform State Laws do violence to one of the basic concepts of the letter of credit, to wit, that the letter of credit agreement is independent of the underlying commercial transaction.' " Cal. Com.Code § 5114, comment 6 (West 1989) (citations omitted); *see Agnew v. FDIC*, 548 F.Supp. 1234, 1238 (N.D.Cal.1982); *New Tech Developments v. Bynamics, Inc.*, 191 Cal.App.3d 1065, 236 Cal.Rptr. 746, 750–51 (Cal.Ct.App.1987); *Mitsui Manufacturers Bank v. Texas Commerce Bank–Fort Worth*, 159 Cal.App.3d 1051, 206 Cal.Rptr. 218, 222 (Cal.Ct.App.1984). *But see Wyle v. Bank Melli*, 577 F.Supp. 1148, 1165 (N.D.Cal.1983) (holding that California law does not prohibit injunctions against issuers when the beneficiary is amenable to service of process and the courts of the beneficiary are effectively closed to the account party plaintiff) (*Wyle* was specifically not followed in *New Tech Develop-*

*ments,* 236 Cal.Rptr. at 751). Thus California would seem even more hostile than the typical state to an injunction in the circumstances before us.

In order to bring this case outside ordinary principles of commercial law, which seem to preclude an injunction, and outside a California version of the U.C.C. that would seem even more hostile to an injunction, Charter One points to two intermediate California appellate court opinions. *See Mitsui,* 159 Cal.App.3d at 1051, 206 Cal.Rptr. at 218; *Steinmeyer,* 42 Cal. App.3d at 515, 116 Cal.Rptr. at 57.

The first of these cases, *Mitsui,* does not offer Charter One much help. The *Mitsui* court enjoined a beneficiary of a letter of credit from calling that letter, but it did so because it believed that the beneficiary could not satisfy a term *contained in the letter itself,* namely a term that required the beneficiary, a bank, to state that a borrower had failed to repay certain "loans drawn ... in connection with drilling of oil wells for [a company named] Simon." *See Mitsui,* 206 Cal.Rptr. at 221. The record before that court made clear that the bank could not make such a statement without lying, and apparently no one could make even a "colorable" argument to the contrary. *See id.* Thus, at most, one might read *Mitsui* as authorizing an injunction against a beneficiary where an effort to call a letter would fall within the scope of the traditional exception for forgery or fraud. *See Trans Meridian Trading, Inc.,* 829 F.2d at 956–57 (reading *Mitsui* narrowly because "[g]iven California's seemingly strong policy honoring letters of credit, it would be illogical to thwart it so easily by enjoining the beneficiary, not the issuer"). At the same time, the *Mitsui* court strongly reaffirmed the principle of "independence." It said that

> "a court should not resort to ... underlying agreements in interpreting a letter of credit.... [N]oncompliance with the underlying contract does not affect the issuer's liability unless a reference to the underlying contract explicitly creates a condition for honoring a draft. General references to underlying agreements are surplusage and should not be considered in deciding whether the beneficiary has complied with the terms of the letter of credit."

*Mitsui,* 206 Cal.Rptr. at 220 (quoting *Pringle–Assoc. Mortgage Corp.,* 571 F.2d at 874)).

The case before us is unlike *Mitsui* in that, here, Westates, the beneficiary, can truthfully say that it satisfied the letter of credit's express conditions; it mailed a ten day notice to Charter One on September 22, 1989. More importantly, since Westates has at least a "colorable" claim that it acted lawfully under the contract in doing so, Westates' call would not fall within the traditional exception for forgery or fraud.

Charter One's second case, *Steinmeyer,* offers it more support. The *Steinmeyer* court enjoined a letter of credit beneficiary, Warner, from calling the letter. In doing so, the court said that the terms of the letter itself "must ... be construed together" with the underlying contract, and it based its injunction upon its belief that the "call" would violate Warner's duty of "good faith and fair dealing" contained in that underlying contract. *See Steinmeyer,* 116 Cal.Rptr. at 59–60. Thus, Charter One argues, the *Steinmeyer* court examined the merits of the underlying contract dispute and enjoined the call on the letter because it concluded that Warner would not likely win that dispute. Similarly, says Charter One, the district court here enjoined Westates' call because it concluded that Westates would not likely win its contract dispute—a matter close enough so that we ought not to second guess the district court on this "preliminary injunction" appeal. *See Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1984) (standards for issuing preliminary injunction and for review of grant of preliminary injunction).

Despite its language, however, the facts of *Steinmeyer* are too special to make it strong precedent for Charter One. The underlying contract involved a sale of stock by Warner to Steinmeyer in return for Steinmeyer's promissory notes; the letter of credit guaranteed Steinmeyer's pay-

ments on the notes; the letter's terms conditioned Warner's call on Warner's statement that Steinmeyer was in default. *See Steinmeyer*, 116 Cal.Rptr. at 59. These facts suggest a typical "contract guarantee letter" designed in part to permit Warner to decide whether or not Steinmeyer was in "default" and to permit Warner to have possession of the money during any subsequent dispute (about default). At the same time, however, one of the promissory notes contained its own special condition. Both that note and the stock sale contract itself said that Steinmeyer could "offset" against the note any undisclosed liability of the corporation (whose stock Steinmeyer bought). *See id.* at 59–60. The *Steinmeyer* court seemed to think that this special provision in the note meant that Steinmeyer could decide whether or not the corporation had a relevant, undisclosed liability, and would (through exercise of the "offset") permit Steinmeyer to have possession of the money during any subsequent dispute (about undisclosed corporate liability). The court wrote that it "would be anomalous to empower Warner to circumvent Steinmeyer's rights of offset simply by seeking payment of the letter of credit." *See id.* at 60. It thus seems to have thought that the parties, through this special provision, had "agreed" to vary the ordinary rules that govern when a beneficiary can call a letter of credit, as the parties have the power to do. *See* U.C.C. § 5–114(2), Cal.Com.Code § 5114(2) (West 1989) (*"Unless otherwise agreed* when documents appear on their face to comply with the terms of a credit...."). If so, *Steinmeyer*, whether right or wrong about the special intent of the parties before it, is irrelevant here, for there is nothing in this record suggesting that the parties before us bargained for any special "letter of credit" legal rules.

■ Regardless, were Charter One's interpretation correct, we would not follow *Steinmeyer*. We should not follow an intermediate state appellate court opinion in a diversity case when we are convinced that the state's supreme court would not do so. *See, e.g., Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776,

1782, 18 L.Ed.2d 886 (1967) (a federal court may disregard a lower state court opinion if " 'it is convinced by other persuasive data that the highest court of the state would decide otherwise.' ") (quoting *West v. American Telephone & Telegraph Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940)) (emphasis omitted); *Dale Baker Oldsmobile v. Fiat Motors of North America*, 794 F.2d 213, 218 (6th Cir.1986). We do not believe the California Supreme Court would follow *Steinmeyer* insofar as it significantly weakens the principle of "independence" of the letter of credit. In particular, we do not believe the California Supreme Court would permit an injunction where other states (applying the traditional "fraud" exception) would not do so. After all, California's state legislature has altered the U.C.C. to make it more difficult in California than elsewhere to enjoin an issuer's payment of a letter of credit; to make it significantly *easier* than elsewhere to enjoin a call by a beneficiary would undercut that underlying legislative policy.

For these reasons the judgment of the district court is

*Reversed.*