**FEDERAL DEPOSIT INSURANCE COR- PORATION, as receiver for the Central Savings Bank, Plaintiff,**

v.

**UNITED STATES TRUST COMPANY and NCC Leasing, Inc., Defendants.**

Civ. A. No. 92–10626–T.

United States District Court, D. Massachusetts.

May 12, 1992.

---

1. Maine constitutes one judicial district and is not divided into divisions. *See* 28 U.S.C. § 99; Note to Local Rule 2.

John W. Gahan, III, Roche, Carens & DeGiacomo, Boston, Mass., for plaintiff.

Edward A. Sokoloff, U.S. Trust Co., Boston, Mass., for defendant U.S. Trust Co.

Mark Niles Berman, David S. Rosenthal, Hutchins & Wheeler, Boston, Mass., for defendant NCC Leasing, Inc.

Mark Niles Berman, David S. Rosenthal, Hutchins & Wheeler, Boston, Mass., for counter-claimant NCC Leasing, Inc.

## MEMORANDUM

TAURO, Chief Judge.

The United States Trust Company ("US Trust"), at the request of Central Savings Bank ("Central"), issued a letter of credit in favor of NCC Leasing, Inc. ("NCC"). The Federal Deposit Insurance Corporation ("FDIC"), as receiver for the now insolvent Central, seeks a preliminary injunction to prevent NCC from collecting under the letter of credit from US Trust. The issue raised by this dispute is the viability of a letter of credit in the face of the formidable protections available to the FDIC as receiver of an insolvent bank.

### I.

The parties have stipulated to the following facts. On December 4, 1990, NCC agreed to lease equipment, over a period of five years, to Central, for sixty monthly payments of $5,675.24. *See* Stipulation As to Uncontested Facts Ex. A ("Stipulation"). As the lease required, Central arranged for

a bank, US Trust, to issue an irrevocable standby letter of credit,[1] naming NCC as beneficiary, in an amount equal to the entire rental stream through the expiration of the lease. *Id.* Ex. B.[2] In exchange for US Trust's providing the letter of credit, Central paid a fee, pledged a certificate of deposit as security, and entered into a pledge agreement with US Trust. A $200,000.00 certificate of deposit in the name of Central is on deposit with US Trust.

On February 14, 1992, Central was declared insolvent, and the FDIC was appointed as receiver. The underlying lease provided that insolvency was an event of default entitling NCC to accelerate rental payments. *See id.* Ex. A ¶ 10. On March 4, 1992, NCC advised US Trust that an event of default under the lease had occurred. *Id.* Ex. C. NCC, thereafter, presented a sight draft and accompanying certification to US Trust, seeking to draw $220,000.00 on the letter of credit. *Id.* Ex. D.

On March 13, 1992, the FDIC disaffirmed[3] the lease, the letter of credit and the pledge agreement. *Id.* at 3. The FDIC then filed this action to prevent NCC from obtaining payment under the letter of credit.

## II.

To obtain a preliminary injunction, the FDIC must demonstrate a likelihood of success on its claim that NCC has no legal right to draw on the letter of credit. *Foxboro Co. v. Arabian American Oil Co.*, 805 F.2d 34, 36 (1st Cir.1986). Under FIRREA, the FDIC need not establish irreparable harm to obtain injunctive relief. *See* 18 U.S.C. § 1821(d)(18), (19).

### A. *The Purpose of Letters of Credit*

A letter of credit transaction is a three-party arrangement. White and Summers

§ 19.2, at 7. First, there is the issuer-customer contract, by which the issuer (here, US Trust) agrees to issue its credit in exchange for a fee and reimbursement from its customer (here, Central). Second, under the credit arrangement, the issuer (US Trust) agrees to pay the beneficiary (here, NCC) upon presentation of conforming documents. Third, there is an underlying contract between the customer (Central) and the beneficiary (NCC) which provides that the customer's performance is secured by the letter of credit. *See Wood v. R.R. Donnelley & Sons Co.*, 888 F.2d 313, 317 (3d Cir.1989); *Voest–Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 682 (2d Cir.1983); White and Summers § 19.2, at 8.

The object of the standby letter of credit is to ensure that the beneficiary will not suffer harm should the customer become unable to make payments under the underlying contract. *See generally Itek Corp. v. First Nat'l Bank*, 730 F.2d 19, 24 (1st Cir.1984) (explaining the purpose of the standby credit). *See also Wood*, 888 F.2d at 317 ("The essential function of this device is to assure a party to an agreement that he will receive the benefits of his performance."); *Exxon Co., U.S.A., Div. of Exxon Corp. v. Banque de Paris et des Pays–Bas*, 828 F.2d 1121, 1124 (5th Cir. 1987) (the credit "substitutes a known, accessible, and demonstrably impeccable source of funds in the event of default by the party whose performance it guarantees"); White & Summers § 19.1, at 4 ("the standby letter of credit acts as a 'back up' against customer default"). Through the letter of credit, therefore, the beneficiary and the customer agree, as a condition of the underlying contract, that a third party, the issuer, will bear the risk of nonpayment

---

**1.** For the difference between a standby letter of credit and a commercial letter of credit, see James J. White and Robert S. Summers, 2 Uniform Commercial Code § 19–1, at 4 (3d ed. 1988) (hereinafter "White and Summers") (commercial credit acts as a payment medium whereas standby credit acts as a guarantee for payment).

**2.** The letter of credit was annually reduced to account for Central's monthly payments under the lease.

**3.** The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") gives the receiver authority to disaffirm any contract or lease which it determines to be burdensome. *See* 12 U.S.C. § 1821(e).

under the contract. *See e.g., Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464, 474 (5th Cir.1985) (letter of credit shifts contractual allocation of risk); *Universal Marine Ins., Ltd. v. Beacon Ins. Co,* 577 F.Supp. 829, 832 (W.D.N.C.1984) (letter of credit eliminates risk to beneficiary that customer will refuse payment); White and Summers § 19–10, at 82 ("the letter of credit [is] a device for shifting the risk of payment from the beneficiary to the bank").

### B. *The Independence Principle*

■ A key component of the letter of credit arrangement is the "independence principle," which is embodied in the Uniform Commercial Code ("U.C.C."). The U.C.C., as adopted in Massachusetts, requires an issuer of a letter of credit to

> honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary.

Mass.Gen.L. ch. 106, § 5–114(1). In other words, "the bank's payment obligation to the beneficiary is primary, direct and completely independent of any claims which may arise in the underlying ... transaction." *Voest–Alpine,* 707 F.2d at 682. *See also* § 5–114 U.C.C. Comment (letter of credit is independent of the underlying contract between the customer and the beneficiary).[4] When considering whether to pay the letter of credit, the issuer need not and, indeed may not, consider whether the beneficiary has performed the underlying contract. Rather, the issuer may only consider whether the beneficiary has presented "the documents that satisfy the 'call' condi-

tions." *Ground Air Transfer, Inc. v. Westates Airlines, Inc.,* 899 F.2d 1269, 1272 (1st Cir.1990). *See generally* White and Summers § 19–2, at 8 (explaining nature of issuer's obligation under a letter of credit).

■ The independence principle applies, as well, in the context of the customer-issuer transaction. *Wood,* 888 F.2d at 318; White and Summers § 19.2, at 9. That is to say, the letter of credit obligates the issuer to pay the beneficiary, regardless of any infirmity in the customer-issuer relationship. White and Summers give this example:

> If ... the customer goes into bankruptcy after the letter has been issued, but before it has been drawn upon, the issuer must pay despite the fact that the customer will not be able to pay the issuer. The same would be true if the customer had repudiated the contract of reimbursement. Since these are the very risks (customer's insolvency or unwillingness to pay) which the beneficiary sought to avoid by demanding the issuance of the letter of credit, it should not be surprising that the issuer cannot assert them as defenses against the beneficiary.

White & Summers § 19.2, at 9. *See also Eakin v. Continental Illinois Nat'l Bank & Trust Co.,* 875 F.2d 114, 116 (1989) ("Issuers of letters of credit take the risk of insolvency."); *Wood,* 888 F.2d at 318 ("The utility of the letter would be destroyed were it made to rely on the customer's credit, rather than the issuer's."). The issuer must pay, therefore, even if the customer cannot satisfy the terms of the agreement.

### III.

■ Given these considerations, courts have consistently recognized that, in the

---

**4.** Numerous cases have recognized this fundamental principle. *See, e.g., Bank of China v. Chan,* 937 F.2d 780, 786 (2d Cir.1991); *Ground Air Transfer, Inc. v. Westates Airlines, Inc.,* 899 F.2d 1269, 1272 (1st Cir.1990); *Gatz v. Southwest Bank of Omaha,* 836 F.2d 1089, 1096 (8th Cir.1988); *Sound of Market Street, Inc. v. Continental Bank Int'l,* 819 F.2d 384, 388 (3d Cir. 1987); *Foxboro,* 805 F.2d at 37–38; *Harris Corp. v. Nat'l Iranian Radio & Television,* 691 F.2d 1344, 1354 (11th Cir.1982); *Weyerhaeuser Co. v.*

*UBAF Arab Am. Bank,* 768 F.Supp. 481, 484 (S.D.N.Y.1991); *Agri Export Coop. v. Universal Sav. Ass'n,* 767 F.Supp. 824, 829 (S.D.Tex.1991); *Integrated Measurement Systems, Inc. v. Int'l Commercial Bank,* 757 F.Supp. 938, 942 (N.D.Ill. 1991); *Mellon Bank, N.A. v. General Electric Credit Corp.,* 724 F.Supp. 360, 364–65 (W.D.Pa. 1989); *Newvector Communications, Inc. v. Union Bank,* 663 F.Supp. 252, 255 (D.Utah 1987); *Warner v. Fed. Deposit Ins. Corp.,* 605 F.Supp. 521, 530 (S.D.Ohio 1984).

absence of fraud,[5] a court should not enjoin payment of a letter of credit. *Ground Air Transfer*, 899 F.2d at 1272 (U.C.C. "narrowly circumscribes the circumstances under which a court can enjoin the issuer" from making payment); *Foxboro*, 805 F.2d at 37 ("[A]n injunction to impede the honoring of a letter of credit is an extraordinary remedy that should rarely be granted."); *Itek*, 730 F.2d at 24. In *Itek*, the court explained that

> The very object of a letter of credit is to provide a near foolproof method of placing money in its beneficiary's hands when he complies with the terms contained in the letter itself. . . .

730 F.2d at 24; *see also Wood*, 888 F.2d at 318 ("the basic policy of letter of credit law" is "to ensure prompt payment to sellers") (citations omitted); *Eakin*, 875 F.2d at 115 ("Letters of credit assure swift and reliable payment in commercial transactions.").

██ As long as "the beneficiary's position in the underlying dispute is colorable" and "the beneficiary can satisfy the terms that the letter of credit itself sets forth as conditions for its call," then the issuer is required to honor the letter of credit, and a court should not issue an injunction preventing payment. *Ground Air Transfer*, 899 F.2d at 1269–1270.

## A. *Beneficiary's Position*

Here, the beneficiary's position in the underlying contract dispute is colorable. NCC performed under the contract by leasing equipment to Central. The lease expressly states that insolvency constitutes an event of default. It is arguable, therefore, that Central breached the lease upon becoming insolvent.

There is no question, furthermore, that NCC can satisfy the terms that the letter of credit sets forth. The letter of credit permits NCC to demand payment when, *inter alia*, there has been a default under

the lease. In order to demand payment, NCC must notify US Trust of its intent to do so, refer to the lease agreement between NCC and Central, and assert that an event of default has occurred. When presenting drafts to US Trust, the letter of credit requires NCC to refer to letter of credit "Number 2212 of United States Trust Company." There is no doubt that NCC has complied with all these requirements. *See Stipulation* and attached exhibits.

## B. *FDIC's Arguments*

██ The FDIC essentially argues that, because FIRREA alters the relationship between NCC and Central vis à vis the underlying lease, the relationship between NCC and US Trust has been correspondingly altered.[6] Normally, the court need not even consider the FDIC's arguments concerning the substance of the underlying dispute. As the court stated in *Ground Air Transfer*, 899 F.2d at 1272,

> Whether in satisfying those conditions— say, as here, by presenting a draft and a copy of a ten day notice—the beneficiary is, or is not, violating the terms of some other document, such as an underlying contract, is normally beside the point, for to prevent the beneficiary from obtaining the money while the court decides the 'underlying contract' question may deprive the beneficiary of the very benefit for which he bargained, namely that any such underlying contract dispute will be 'resolved while he is in possession of the money.'

899 F.2d at 1272 (quoting *Itek*, 730 F.2d at 24). Nonetheless, because of the possibility that, through FIRREA, Congress gave the FDIC authority to restrict "the near inviolableness," *Foxboro*, 805 F.2d at 37, of letters of credit, the court will consider the FDIC's arguments.

---

**5.** *See, e.g., Itek*, 730 F.2d at 24 (court can enjoin payment of letter of credit if there is "fraud in the transaction"). There is no evidence of fraud here, despite US Trust's assertions to the contrary.

**6.** The FDIC argues, for example, that "[w]hatever rights NCC has against the Bank are derived solely from the Lease; the Letter of Credit only secures obligations under the Lease." Mem. in Supp. of FDIC's Mot. for Prelim. Inj. at 8.

The FDIC argues that there was no event of default under the lease because FIRREA makes "ipso facto" clauses unenforceable against the receiver. In other words, a creditor of an insolvent bank cannot enforce, against the FDIC, a clause in an agreement which makes insolvency of the bank an event of default.

This citation to FIRREA is misplaced. The FDIC relies solely on 12 U.S.C. § 1821(e)(12)(A) for the proposition that ipso facto clauses are unenforceable against the FDIC. But that statute provides, in pertinent part:

> The conservator or receiver may enforce any contract ... entered into by the depository institution notwithstanding any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or the appointment of a conservator or receiver.

This provision does not void a default clause in a lease. Rather, its terms merely permit the receiver to enforce a failed bank's contract if it chooses to do so, irrespective of an ipso facto clause. For example, if the FDIC wanted to continue renting the equipment from NCC, it could enforce the lease despite the lease's ipso facto clause. Here, however, the FDIC does not seek to enforce the Central/NCC lease. To the contrary, it seeks to disaffirm the lease in furtherance of its efforts to wind up the bank's affairs.

The FDIC further argues that FIRREA specifically limits the kinds of damages that may be awarded under a lease agreement. FIRREA prohibits, for example, claims for damages under any acceleration or other penalty provision of a lease. 12 U.S.C. § 1821(e)(4)(B)(ii). The only damages NCC may collect, according to the FDIC, are "for any unpaid rent ... due as of the date of appointment" of FDIC as receiver. 12 U.S.C. § 1821(e)(4)(B)(iii).

NCC, however, does not seek to enforce the acceleration clause against the FDIC. Indeed, at this juncture, NCC is not seeking to enforce its rights under the lease. Rather, NCC seeks to enforce its rights against US Trust under the letter of credit, independent of the underlying lease agreement.

### IV.

For all the foregoing reasons, the FDIC's Motion for a Preliminary Injunction is DENIED.