**WEYERHAEUSER COMPANY, Plaintiff,**

v.

**UBAF ARAB AMERICAN BANK, Defendant.**

**No. 89 Civ. 1977 (BN).**

United States District Court, S.D. New York.

Aug. 5, 1991.

Paul, Weiss, Rifkind, Wharton & Garrison, Moses Silverman and Jane A. Levine, New York City, for plaintiff.

Hughes Hubbard & Reed, Thomas T. Tamlyn, Jr., New York City, for defendant.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge, United States Court of International Trade, sitting as a United States District Court Judge by Designation:

### Introduction

This diversity action, 28 U.S.C. § 1332(a), arises out of the alleged liability of UBAF Arab American Bank, a New York commercial bank ("UBAF"), in the sum of $109,-145.86 to Weyerhaeuser Company, a Tacoma, Washington producer of tree logs and other forestry products ("Weyerhaeuser"), under a transfer letter of credit ("transfer letter"). Determination of UBAF's liability under the transfer letter revolves primarily around a disputed issue of fact as to whether Weyerhaeuser presented one or two commercial invoices to UBAF.

## Parties' Contentions

*UBAF's Contentions:* Payment to Weyerhaeuser under the transfer letter of $304,777.11 rather than $413,922.97 (the amount of Weyerhaeuser's draft), was proper because: (1) a single commercial invoice was presented by Weyerhaeuser (No. 4306–423) containing a calculation error in the total purchase price of $413,-922.97, and hence an error in the amount of Weyerhaeuser's draft for the same sum; (2) the unit price of $55.00 per cubic meter ("CBM") shown on the single invoice was applicable to the total number of CBM shown on the invoice, 5,541.402 CBM; (3) Carol Grothen, Account Analyst at Weyerhaeuser, telephoned UBAF prior to payment of Weyerhaeuser's draft, discussed the recalculation of the amount due with Marilyn Egan, Bank to Bank Supervisor at UBAF, and Melissa Donovan, Document Checker at UBAF, and Grothen consented to the reduced payment.

*Weyerhaeuser's Contentions:* UBAF was required to pay the full amount of Weyerhaeuser's draft, $413,922.97, because: (1) two commercial invoices, each covering a different grade of logs with different unit prices and quantities were presented to UBAF, Nos. 4306–426 and 4306–423, together totalling the amount of the draft; (2) there was no computational error in the "TOTALS" shown on Invoice No. 4306–423 or in the amount of Weyerhaeuser's draft; (3) Grothen never consented to UBAF's short payment of Weyerhaeuser's draft; (4) in any event, if UBAF believed that there was an error in the total price shown in Invoice No. 4306–423, UBAF had no right to accept Weyerhaeuser's documentation, recalculate—unilaterally and without notice to Weyerhaeuser—the total sum due, pay Weyerhaeuser a reduced amount and release the title documents to the purchaser; and (5) any nonconformity of Weyerhaeuser's documents to the conditions of the credit was waived because UBAF accepted the documents and never notified Weyerhaeuser of any discrepancy.

## Findings of Fact

This dispute has its genesis in the 1988 sale of tree logs by Weyerhaeuser to U.S. Forestry and an export resale of such logs by the latter to a Turkish company, Boyacioglu Ahsap Sanaye Ve Tic., S.A. ("Boyacioglu"). The Turkish company financed its purchase of the logs from U.S. Forestry under a letter of credit, and U.S. Forestry in turn paid its supplier Weyerhaeuser through a partial transfer of the letter of credit dated June 15, 1988. A $109,145.86 short payment to Weyerhaeuser under UBAF's transfer letter gives rise to the instant lawsuit.

The pertinent background of UBAF's transfer letter follows:

On March 8, 1988 Boyacioglu opened a transferable letter of credit with a Turkish bank, Al Baraka Turkish Finance House, in favor of U.S. Trade, Inc. (U.S. Forestry) to cover payment for Boyacioglu's purchase of logs from U.S. Forestry. UBAF Paris confirmed this letter of credit.

On June 7, 1988, U.S. Forestry, the initial beneficiary of the letter of credit, applied to UBAF for a partial transfer of credit in favor of Weyerhaeuser to pay for the logs purchased from the latter and destined for export to Boyacioglu. The transfer application requested UBAF to transfer to Weyerhaeuser U.S. Forestry's rights under the letter of credit to draw up to $426,250.00 subject to certain terms and conditions, including a unit price limitation of $55.00 per CBM. The transfer application further requested UBAF to "notify the transferee [Weyerhaeuser] in such form as you deem advisable of the terms and conditions of the credit as transferred and * * * return a copy of your notification to the transferee." On June 7, 1988 U.S. Forestry sent a copy of its transfer application, unsigned and unapproved by UBAF, to Weyerhaeuser.

On June 15, 1988 pursuant to U.S. Forestry's application, UBAF issued a confirmed transfer letter in favor of Weyerhaeuser (pltf's exh. 1). By such transfer letter, UBAF agreed to pay drafts drawn on UBAF by Weyerhaeuser for amounts up to a total of $426,250 provided that the

draft was accompanied by specified documents (commercial invoice, certificate of origin, bill of lading, tally sheet and phytosanitary certificate) and that Weyerhaeuser complied with all other terms of the transfer letter. UBAF failed to stipulate a $55.00 per CBM unit price limitation and also failed to send Weyerhaeuser an approved copy of U.S. Forestry's application with the transfer letter, as specifically directed by U.S. Forestry.

The transfer letter by its express terms was governed by the Uniform Customs and Practice for Documentary Credits (1983 Revision), International Chamber of Commerce Publication 400 ("UCP").

By letter dated June 22, 1988 UBAF was specifically requested by its customer U.S. Forestry: "Upon acceptance of the documents [from Weyerhaeuser] please discount our draft and wire transfer USD 304,777.11 to our transferee, Weyerhaeuser Co., in Seattle, Washington" (pltf's exh. 18). Neither U.S. Forestry nor UBAF sent Weyerhaeuser a copy of that letter.

Under two covering letters dated July 1, 1988 (pltf's exh. 5) Weyerhaeuser's Export Documentation Specialist, Marion Anderson, forwarded to UBAF by Federal Express overnight mail a package containing: a draft for $413,922.97; two single page commercial invoices—No. 4306–426 covering 4,547.744 CBM of Hemlock General Structural logs priced at $79 per CBM unit, and a second invoice, No. 4306–423 covering 993.658 CBM of Hemlock Economy Logs priced at $55 per CBM unit. Cumulative quantity and price "TOTALS" for the logs covered by both invoices were carried over and shown at the bottom of Invoice No. 4306–423: 5,541.402 cubic meters and $413,922.97 (pltfs. exh. 5). One of the two Anderson covering letters of July 1, 1988 expressly refers to the two invoices enclosed by invoice numbers: "Attached is our 120 day draft # 42 for $413,922.97 covering shipment of logs on the 'MARIN TRADER' V/6 *under our invoice numbers 4306–426 and 4306–423*" (emphasis added). There is no dispute that Weyerhaeuser presented all other documents required under the transfer letter. While each of the two commercial invoices described a single grade of logs, the accompanying shipping and title documents presented to UBAF made reference to both grades of logs: Hemlock Economy and Hemlock General Structural. Anderson prepared the two commercial invoices sent to UBAF from internal Weyerhaeuser mill invoices to which the required product description was inserted to comply with the terms of the credit.

On July 8, 1988 UBAF's Document Checker Melissa Donovan and her supervisor, Marilyn Egan, reviewed the presentation. Neither a computational error nor a recalculation concerning Weyerhaeuser's presentation was noted in UBAF's internal records.

As requested in U.S. Forestry's letter of June 22, 1988, UBAF made a wire transfer of $304,777.11 to Weyerhaeuser's account at the Bank of California—$109,145.86 less than the Weyerhaeuser draft submitted to UBAF—without any prior notice to Weyerhaeuser that its draft would only be partially paid and the reasons therefor. On the same day that UBAF paid Weyerhaeuser, the bank sent Weyerhaeuser's title documents to the Al Buraka Turkish Finance House, thereby facilitating transfer of title to the logs to Boyacioglu, the ultimate purchaser.

On July 12, 1988 Weyerhaeuser received a payment advice from the Bank of California of the wire transfer of $304,777.11 (pltf's exh. 9). Grothen thereupon checked the amount of the payment against the company's records and discovered the shortfall of $109,145.86. On the face of the payment advice Grothen noted "partial payment," the two invoice numbers, the sum due under each of the invoices, the amount of the partial payment ($304,-777.11) and the balance due of $109,145.86 (pltf's exh. 9).

On July 14, 1988 Grothen called UBAF on the telephone several times to inquire about the short payment. Grothen was advised by Maryse LaPierre, Vice President in the Letters of Credit Department, that the short payment of Weyerhaeuser's draft was due to problems relating to quan-

tity and unit price and because UBAF had followed the payment instructions from U.S. Forestry, the bank's customer, to pay Weyerhaeuser only $304,777.11 (pltf's exh. 18). Upon returning from his vacation in August 1988, Craig Lucchesse, Grothen's supervisor, learned of the short payment and also called LaPierre to resolve the matter. The matter could not be resolved and this lawsuit followed.

### Discussion and Conclusions of Law

Letters of credit are a well recognized commercial financing device used extensively in international sales transactions. *All Service Exportacao v. Banco Bamerindus Do Brazil, S.A.*, 921 F.2d 32 (2d Cir.1990). Such device serves to reduce the risk of nonpayment to the seller of goods on credit by a foreign purchaser. *Voest–Alpine Intern. Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680 (2d Cir.1983).

■■■ "A typical letter of credit transaction involves three separate and independent relationships—an underlying sale of goods contract between buyer and seller, an agreement between a bank and its customer (buyer) in which the bank undertakes to issue a letter of credit, and the bank's resulting engagement to the beneficiary (seller) providing that certain documents presented to the bank conform with the terms and conditions of the credit issued on the customer's behalf. Significantly, the bank's obligation to the beneficiary is primary, direct and completely independent of any claims which may arise in the underlying sale of goods transaction." *Voest–Alpine*, 707 F.2d at 682. The bank's obligation to pay the beneficiary is conditioned on compliance with the terms set forth in the letter of credit. *Id. See also Philadelphia Gear Corp. v. Central Bank*, 717 F.2d 230 (5th Cir.1983).

■■■ It is apparent that the instant dispute presents essentially questions of fact. The testimony presented in this case by the parties is sharply conflicting, and consequently, an assessment of the credibility of the witnesses is the critical element in the court's determinations. For the reasons that follow, the court concludes that plaintiff has sustained its burden of proof and that UBAF's defenses were not supported by credible evidence.

*UBAF's Alleged Recalculations on Invoice No. 4306–423:* Among the documents Weyerhaeuser was required to present by the transfer letter was a "Commercial invoice in (6) copies." As noted above, the primary issue in this case is whether Weyerhaeuser presented one invoice (No. 4306–423), as claimed by UBAF, or two invoices (Nos. 4306–423 and 4306–426), as insisted by Weyerhaeuser.

UBAF asserts that the documents presented by Weyerhaeuser complied with all terms and conditions of the credit except for a miscalculation of the amount due on the single invoice presented, Invoice No. 4306–423: "the unit price [$55.00] multiplied by the amount of goods shown [5,541.402 CBM] yielded a payment due Weyerhaeuser of $304,777.11, not the $413,922.97 figure presented by Weyerhaeuser on its invoice and draft request" (defendant's proposed conclusion of law No. 2). Donovan testified that a calculation error was obvious—she could not make sense out of the invoice as the line entry at the top for 993.658 CBM of "HEMLOCK ECONOMY SORT LOGS" priced at $55.00 per CBM could not be reconciled with the "TOTALS" of 5,541.402 CBM and $413,922.97 at the bottom of the invoice or with the information on the other papers presented.

UBAF asserts that despite the fact only *993.658 CBM of Hemlock Economy logs were invoiced, as shown at the line entry at the top* of Invoice No. 4306–423, UBAF acted properly in recalculating the total price due Weyerhaeuser under the transfer letter by multiplying the $55.00 per CBM unit price by the *total amount of logs shipped, 5,541.402 CBM*, resulting in a reduced total price of $304,777.11. UBAF further posits that because there was simply a computational error, there was no need to totally reject the documents or even notify Weyerhaeuser of the alleged calculation error. Further, UBAF maintains that there was nothing before the bank that should have alerted it to a second missing invoice covering other logs; and

despite the asserted confusion, it was appropriate for Egan and Donovan to ignore Anderson's covering letter showing there were two invoices in Weyerhaeuser's presentation and to disregard the product descriptions in the shipping and title documents showing that two grades of logs were shipped.

Weyerhaeuser insists that it presented two single page invoices, each marked "1 of 1": Invoice No. 4306–426 covering 4,547.744 CBM of "HEMLOCK GENERAL STRUCTURAL SORT LOGS," with a unit price of $79.00 per CBM, with a total price of $359,271.78; and Invoice No. 4306–423 covering 993.658 CBM of "HEMLOCK ECONOMY SORT LOGS" priced at $55.00 per CBM with a total price of $54,651.19. Accordingly, Weyerheuser contends, there was no computational error in the cumulative "TOTALS" shown at the bottom of Invoice No. 4306–423 of 5,541.402 cubic meters and $413,922.97.

Weyerhaeuser further argues that it was obvious from looking at the "TOTALS" at the bottom of Invoice No. 4306–423 and the accompanying shipping and title documents (bill of lading, certificate of origin, etc.) that there was a second invoice in the presentation covering the Hemlock General Structural logs.

Finally, Weyerhaeuser insists that, in any event, the transfer letter imposed no limitation of $55.00 per CBM and UBAF had no right to accept its documents, make computational changes in the invoice without notice to Weyerhaeuser, distribute its title documents to the purchaser, and make only partial payment of Weyerhaeuser's draft.

Defendant's evidence to the effect that it received only one invoice, that it had no reason to suspect there was a second missing invoice, and therefore was led to believe that there was simply a calculation error in the total price on the one invoice presented, is clearly fabricated and totally lacking in credibility. It is apparent to the court that UBAF limited its payment of Weyerhaeuser's draft for $413,922.97 to the amount stipulated by U.S. Forestry in its letter of June 22, 1988, $304,777.11.

UBAF was unable to produce a single work sheet or other internal document generated in the course of document review that records any discrepancy or in any manner evidences the alleged recalculations. UBAF's contention that it was its normal operating procedure in checking documents not to make any note in its internal records of a gross computational error in an invoice, not to retain any record to substantiate the alleged recalculated figures and not to request a corrected invoice for its own records strains credulity.

It is plain to the court that Weyerhaeuser presented and UBAF received the two invoices, and hence there was no discrepancy in the figures and no "recalculations" were necessary or ever occurred. Anderson's covering letter identified the two commercial invoices by number, and the accompanying shipping and title documents (i.e., the phytosanitary certificate, certificate of origin, bill of lading, etc.) made reference to the two grades of logs covered by the invoices. Hence, the "TOTALS" at the bottom of Invoice No. 4306–423 obviously embraced logs other than the Hemlock Economy grade described above, and experienced document checkers like Donovan and Egan would have been looking for the second invoice.

In short, the court is unable to give any credence whatever to the testimony of either Donovan or Egan that they saw only one invoice, that nothing appeared to be missing, that they had no reason to believe there was anything other than simply a calculation error in arriving at the total price in Invoice No. 4306–423, and that U.S. Forestry's instructions to pay $304,777.11 (pltf.'s exh. 18) played no role in UBAF's decision to pay Weyerhaeuser $109,145.86 less than the amount of its draft. On the other hand, the testimony of Anderson, particularly regarding the specific steps she took to prepare the package sent to UBAF, which included two invoices covering the two grades of logs, is convincing in light of the demonstrated meticulous handling of the compilation of paperwork and by her office file in which Anderson retained copies of the documents presented

to UBAF, which included the two commercial invoices.

*Weyerhaeuser's Alleged Telephone Consent to Reduced Payment:*

Egan and Donovan testified that Grothen telephoned the bank twice on July 7, 1988, Egan discussed the alleged recalculations with Grothen and the latter then consented to accept the reduced amount. This court can give very little, if any, credence to UBAF's evidence that Grothen called UBAF, and knowing that two invoices had been presented covering two different grades of logs with different unit prices ($55.00 and $79.00), consented to the reduced payment based on solely the $55.00 unit price in one invoice. Such a highly tenuous scenario, emphatically denied by Grothen, is unsubstantiated by any record, memorandum, notation, form, work sheet or other documentation in UBAF's own paperwork generated by Egan or Donovan. Significantly, such total lack of any internal documentation in UBAF's files of any discrepancy, recalculation, or most important, of such a vital and legally significant event as a beneficiary's oral authorization to a substantial short payment of over $109,000, casts serious doubt on the credibility of the testimony of defendant's witnesses.

Grothen's credible testimony persuades the court to find that she never made a telephone call to UBAF prior to July 14, 1988 when Grothen first discovered the short payment, that Grothen never orally consented to payment of the lesser amount in any communication with either Egan or Donovan, and that UBAF never even sought Grothen's consent by telephone to the underpayment.

Grothen's testimony that she did not call UBAF prior to July 14, 1988 is strongly buttressed by the regularly generated records of outgoing long distance telephone calls of Weyerhaeuser's Telecommunications Department (pltf's exh. 25), which reflect an absence of any telephone call from any telephone line in the Export Credit Department to UBAF prior to July 14,

1988, the date that the underpayment was discovered by Grothen. The possibility suggested by UBAF that Grothen could have initiated the telephone contacts from nearby telephones not covered by the computerized billing records submitted at trial is sheer speculation, and clearly inadequate to discredit Grothen's emphatic denial that such communications ever took place.

*UBAF's Waiver of Noncompliance:* UBAF argues that there was an obvious miscalculation or typographical error in Invoice No.4306–423, which did not justify refusal of Weyerhaeuser's documents or require notice to Weyerhaeuser. The latter, on the other hand, posits: the alleged "miscalculation or typographical error" (resulting in a short payment of $109,145.86), if it existed, required refusal of and return of Weyerhaeuser's documents; and further, that any nonconformities were waived by UBAF's acceptance of the documents presented and failure to give notice of nonconformities to Weyerhaeuser.

Since it has been determined that Weyerhaeuser's documents included the two invoices and otherwise completely conformed with conditions of the credit, the court need not reach the issue of waiver of nonconformities.

*Conclusion*

The court has carefully reviewed the documentary exhibits, the testimony adduced by the parties, and their post-trial submissions and must completely agree with all of Weyerhaeuser's contentions. Consequently, UBAF was obligated to pay the full amount of Weyerhaeuser's draft—$413,922.97—covering the logs under both invoices.

The Clerk is directed to enter judgment for plaintiff in the sum requested of $109,145.86, plus costs.