**3COM CORPORATION,**
**Plaintiff–Appellee,**

v.

**BANCO DO BRASIL, S.A.,**
**Defendant–Appellant.**

**Docket No. 98–7658.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 4, 1999.

Decided March 22, 1999.

---

David Rabinowitz, Moses & Singer LLP, New York, N.Y. (Michael Evan Avidon and Michael J. Richter, of counsel), for Plaintiff–Appellee 3Com Corporation

Michael T. Welch, Wang & Wang, San Francisco, CA (Francis S.L. Wang, of counsel), for Defendant–Appellant Banco do Brasil, S.A.

Before: CARDAMONE, CABRANES and STRAUB, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge:

Banco do Brasil, S.A. ("Banco") appeals from a final judgment of the United States District Court for the Southern District of New York (Sonia Sotomayor, *Judge*) awarding 3Com Corporation ("3Com"), the beneficiary of a standby letter of credit issued by Banco, $250,000, plus interest and costs, for Banco's wrongful dishonor of two drafts on the letter of credit by 3Com. *See 3Com Corp. v. Banco de Brasil, S.A.*, 2 F.Supp.2d 452 (S.D.N.Y.1998). In this appeal, Banco contends that the District Court erred by granting summary judgment for 3Com based upon conclusions that Banco's notice of non-renewal of the letter of credit had been ineffective, and that 3Com's drafts on the letter of credit had not been fraudulent. We affirm.

## I. BACKGROUND

### A. The Letter of Credit Transaction

A typical letter of credit transaction involves three separate and independent relationships, each of which existed here: (1) an underlying commercial transaction between a buyer and a seller, (2) an agreement between a bank and its customer (the buyer), pursuant to which the bank agrees to issue a letter of credit supporting the buyer's obligations to the credit's beneficiary (the seller), and (3) the bank's resulting engagement to honor drafts or other demands for payment by the beneficiary, on the condition that the demand is accompanied by certain documents presented to the bank in conformity with the terms of the letter of credit. *See, e.g., Voest–Alpine Int'l Corp. v. Chase Manhattan Bank, N.A.*, 707 F.2d 680, 682 (2d Cir.1983); *First Commercial Bank v. Gotham Originals, Inc.*, 64 N.Y.2d 287, 294, 486 N.Y.S.2d 715, 475 N.E.2d 1255 (1985). Fundamental to the letter of credit transaction is the principle that "the issuing bank's obligation to honor drafts drawn on a letter of credit by the beneficiary is separate and independent from any obligation of its customer to the beneficiary under the sale of goods contract and separate as well from any obligation of the issuer to its customer under their agreement." *First Commercial Bank*, 64 N.Y.2d at 294, 486 N.Y.S.2d 715, 475 N.E.2d 1255.

### 1. The Underlying Commercial Transaction

In October 1993, 3Com entered into a distributorship agreement with Comp Service Ltda ("Comp Service") and Expasa Florida, Inc. ("Expasa") pursuant to which Comp Service, with Expasa acting as its purchasing agent in the United States, became an authorized distributor of 3Com products in Brazil. In June 1994, Comp Service notified 3Com that Comp Service had "transferred" purchasing responsibilities from Expasa to Techtrade Export Inc. ("Techtrade") and that Expasa's obligations under the distributorship agreement would "be carried over to Techtrade." In October 1994, Comp Service signed a continuing guaranty, pursuant to which it unconditionally guaranteed the satisfaction of all of Techtrade's obligations to 3Com under the distributorship agreement. In the guaranty, Comp Service agreed that it would be directly liable to 3Com for Techtrade's obligations, and Comp Service waived all rights to require 3Com to proceed against Techtrade.

### 2. The Agreement for Issuance of the Credit

In November 1994, Comp Service arranged for Banco to issue a $250,000 irrevocable standby letter of credit (the "Credit") to support payment of Comp Service's obligations to 3Com. The Credit was issued by Banco on November 21, 1994 and amended on December 21, 1994, with Bank of America acting as the "advising bank," a party that links the issuer and the beneficiary primarily by conveying information between these previously unrelated parties. *See, e.g., Merchants Bank of N.Y. v. Credit Suisse Bank*, 585 F.Supp. 304, 308 (S.D.N.Y.1984); *First Commercial Bank*,

64 N.Y.2d at 296, 486 N.Y.S.2d 715, 475 N.E.2d 1255.

### 3. *The Obligations Under the Credit*

Under the terms of the Credit, Banco promised to duly honor any draw by 3Com, up to $250,000, if accompanied by a signed statement that "The amount of the draft which this statement · accompanies will be applied by us [3Com] to indebtedness due and owing by Comp Service Ltda for invoices which Comp Service Ltda defaulted on the payment terms to 3Com Corp." The Credit had an "expiry" (*i.e.,* expiration) date of May 20, 1995, but contained an "evergreen clause" providing that the Credit "shall be automatically extended, without written amendment, in each successive calendar year unless we [Banco] send to you [3Com, via Bank of America] written notice that we have elected not to renew the credit beyond such date (a 'notice of termination')."

### B. *Banco's Attempts to Cancel the Credit*

On May 20, 1995, the Credit was renewed automatically for an additional calendar year ending May 20, 1996.

In July 1995, December 1995, and January 1996, Banco sent telexes to Bank of America stating: "Please obtain from beneficiary authorization to cancel [the Credit]." On each of these occasions, Bank of America responded, within three weeks, with a telex stating: "Please be informed that beneficiary 3Com Corporation does not agree to cancel subject letter of credit at this time."

On either May 10 or May 13, 1996 (the evidence is inconsistent as to the precise date), Banco sent a telex (the "May 1996 telex") to Bank of America stating "Please cancel [the Credit] and release us from liabilities. . . ." On May 16, 1996, Bank of America sent a letter to 3Com stating:

We are advised by the applicant, Comp Service Ltda, Sao Paolo that they wish to have the above Letter of Credit cancelled.

If you agree to such request, please return the original Letter of Credit along with your written agreement that you no longer have any interest in the Letter of C[sic] Credit.

On June 13, 1996 Banco sent another telex stating: "[The Credit] was previously due on May 20, 1995 and automatically renewed until May 20, 1996. Please consider our [May 13 telex] as a notice of termination and release us from liabilities." On July 5, 1996 Banco sent yet another telex stating: "Please consider our [May 13 and June 13 telexes] as notice of termination. We are closing our files."

Bank of America responded on July 9, 1996 with a telex stating:

Further to your request for cancellation of above referenced letter of credit we wish to inform your [sic] that beneficiary declines your request. Subject letter of credit is therefore in full force and effect until May 20, 1997 or its future expiration date as long as the automatic renewal clause is in effect.

On July 11, Banco sent a telex stating: "We sent to you on May 13, 1996, a [telex] requesting cancellation of the standby letter of credit which corresponds to notice of termination. We therefore cannot accept the automatic renewal." Finally, Bank of America responded on July 13 with a telex stating: "Further to your [July 11 telex] we wish to point out that your message dated May 13, 1996 was a request to cancel subject L/C and did not refer to notice of cancellation and the beneficiary rejected cancellation and considers the L/C to be valid until May 20, 1997."

### C. *Drafts and Dishonor*

Subsequently, on July 19, 1996 and May 9, 1997, 3Com presented drafts for the full amount of the Credit; each draft was accompanied by the required statement that "The amount of the draft which this statement accompanies will be applied by us to indebtedness due and owing by Comp Ser-

vice Ltda for invoices which Comp Service Ltda defaulted on the payment terms to 3Com Corp." On August 2, 1996, Banco gave notice of dishonor of the first draft, on the grounds that the Credit had expired on May 20, 1996, and that the invoices at issue were in the name of, and covered goods shipped to, Techtrade (Comp Service's purchasing agent) rather than Comp Service itself. On May 15, 1997, Banco gave notice of dishonor of the second draft, on the single ground that the Credit had expired on May 20, 1996.

## D. *Proceedings Below*

On May 23, 1997, 3Com filed the instant action, alleging two counts of wrongful dishonor, in the United States District Court for the Southern District of New York, which had diversity jurisdiction pursuant to 28 U.S.C. § 1332. 3Com subsequently moved for summary judgment; Banco opposed 3Com's motion and cross-moved for summary judgment, arguing (1) that its May 1996 telex was an effective notice of non-renewal, thereby causing the Credit to expire before 3Com presented its drafts, and (2) that, in any event, the dishonors were valid because 3Com's drafts were tainted by "fraud in the transaction."

The District Court concluded that Banco's notice of non-renewal needed to be "clear and unequivocal," that—as a matter of law—Banco's May 1996 telex was not clear and unequivocal, and that the evidence could not reasonably support a finding of "fraud in the transaction." Accordingly, the District Court granted 3Com's motion for summary judgment, denied Banco's cross-motion, and entered a final judgment in favor of 3Com in the amount of $250,000 plus interest and costs.

This timely appeal followed.

## II. DISCUSSION

We review *de novo* a district court's entry of summary judgment. *See, e.g.,*

*Bogan v. Hodgkins,* 166 F.3d 509, 511 (2d Cir.1999). "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). In determining whether a genuine factual issue exists, courts must resolve all ambiguities and draw all inferences in favor of the non-movant. *See id.*

■ Because subject matter jurisdiction in this case is predicated on diversity of citizenship, we would ordinarily be guided by the choice-of-law principles of the forum state, which in this case is New York, *see Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Krock v. Lipsay,* 97 F.3d 640, 645 (2d Cir.1996), and in turn these principles might, under some circumstances, direct us to apply the substantive law of a jurisdiction other than New York. However, the parties rely exclusively on New York substantive law, and "where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." *American Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir.1997).

## A. *Non–Renewal of the Credit*

As noted above, the Credit by its terms expired on May 20, 1996 only if Banco gave an effective notice of non-renewal. Banco maintains that its May 1996 telex, which stated "Please cancel the telex and release us from liabilities," constituted just such a notice. In response, 3Com contends that the telex was merely a request for consensual, early termination of the Credit.[1] In concluding that the May 1996 telex did not constitute effective notice, the District Court held, first, that the notice needed to be "clear and unequivocal," and,

---

1. Under the parties' agreement, Banco could not terminate the Credit prior to the renewal

date without 3Com's consent.

second, that the May 1996 telex could not reasonably be found to meet that standard. In this appeal, Banco challenges both elements of the District Court's conclusion.

### 1. "Clear and Unequivocal" Standard

The Credit provides for an automatic annual extension unless Banco gives 3Com "written notice that [Banco has] elected not to renew the Credit." The Credit here also expressly incorporates the International Chamber of Commerce's Uniform Customs and Practice for Documentary Credits (the "UCP"). We have previously observed that

> [t]he UCP enjoys a unique status. Although it is not law, the UCP applies to most letters of credit ... because issuers generally incorporate it into their credits, and the New York Uniform Commercial Code expressly provides that it "does not apply to a letter of credit or a credit if by its terms or by agreement, course of dealing or usage of trade such letter of credit or credit is subject in whole or in part to the [UCP]." N.Y. U.C.C. § 5–102(4) (McKinney's 1991).

*Alaska Textile Co. v. Chase Manhattan Bank, N.A.,* 982 F.2d 813, 816–17 (2d Cir. 1992) (citations omitted). Although the UCP does not explicitly mention notices of non-renewal, the District Court concluded that its treatment of closely analogous issues, along with the principles and policies underlying the UCP generally, indicated that the "written notice" of non-renewal called for in the Credit would have to be clear and unequivocal.[2] We agree.

Simplicity and certainty are the hallmarks of the letter of credit transaction and explain the letter of credit's great

utility. *See id.* at 815. These characteristics derive primarily from the fundamental principle that the letter of credit is an obligation wholly independent of the underlying commercial transaction. *See id.* In other words, the issuing bank must promptly honor drafts complying with the terms of the letter of credit, regardless of any disputes related to the underlying commercial transaction between the beneficiary and the issuer's customer.

In support of this "doctrine of independent contracts," beneficiaries are required, when presenting drafts, to strictly comply with the terms of the letter of credit, so that the issuing bank need not decide whether any non-compliance is substantial in the context of the underlying commercial transaction. *See id.* at 816; *Voest–Alpine,* 707 F.2d at 682–83. "The corollary to the rule of strict compliance is that ... [s]ince the beneficiary must comply strictly with the requirements of the letter, it must know precisely and unequivocally what those requirements are." *Marino Indus. Corp. v. Chase Manhattan Bank, N.A.,* 686 F.2d 112, 115 (2d Cir. 1982) (citing *Venizelos, S.A. v. Chase Manhattan Bank,* 425 F.2d 461, 466 (2d Cir. 1970)).

These background principles of letter of credit law and policy are reflected in specific provisions of the UCP. For example, UCP art. 5(a) promotes the simplicity and certainty of letter of credit transactions through a requirement that instructions for issuance or amendment of a credit, like the credit or amendment itself, "must be complete and precise."[3] A related provision, UCP art. 12, states that a credit will be "advised, confirmed, or amended, only when complete and clear instructions have

---

**2.** As an alternative holding, the District Court predicted that New York law would independently mandate a clear and unequivocal standard for the notice of non-renewal. Because we agree with the District Court that the parties' agreement itself called for such a standard of its own force, we need not assess the court's prediction of New York law.

**3.** The certainty achieved by these requirements is especially important where, as here, the issuer's instructions are communicated to the beneficiary through an intermediary, the advising bank.

been received." Finally, UCP art. 42, which requires all credits to stipulate an expiry date and which explicitly discourages the use of marginally unclear terms— such as those providing "that the Credit is to be ·available 'for one month', 'for six months', or the like"—provides additional support for an extension of the "clear and unequivocal" standard to termination of a credit.

In sum, there was ample support for the District Court's conclusion that, through its incorporation of the UCP, the Credit required that Banco's notice of non-renewal be clear and unequivocal.

Nevertheless, Banco contends that because the provisions of the UCP do not explicitly mention such notices, the District Court erred in failing to apply the UCC's general definition of notice, which provides:

> Subject to additional definitions contained in the subsequent Articles of this Act which are applicable to specific Articles or Parts thereof, and unless the context otherwise requires, in this Act:
>
> \* \* \*
>
> (26) A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. . . .

N.Y. U.C.C. § 1–201(26). We disagree.

As we have already noted, the UCC expressly provides that it does not apply to a letter of credit that incorporates the UCP. *See* N.Y. U.C.C. § 5–102(4). And, while some courts have nonetheless applied the UCC to letters of credit that incorporated the UCP, they have done so only in situations where the UCP did not

speak to the issue at hand. *See, e.g., United Bank Ltd. v. Cambridge Sporting Goods Corp.,* 41 N.Y.2d 254, 258, 392 N.Y.S.2d 265, 360 N.E.2d 943 (1976); *Weyerhaeuser Co. v. Israel Discount Bank of N.Y.,* 872 F.Supp. 44, 46 (S.D.N.Y.1994); *Algemene Bank Nederland, N.V. v. Soysen Tarim Urunleri Dis Ticaret Ve Sanayi, A.S.,* 748 F.Supp. 177, 181 (S.D.N.Y.1990). Here, by contrast, closely analogous provisions of the UCP, along with its underlying principles and policies, clearly militate in favor of the standard adopted by the District Court. Moreover, we do not believe that the UCC provision identified by Banco speaks directly to the issue before us.[4] Accordingly, there is no reason to apply the UCC in this case.

In sum, we agree with the District Court that, to prevent the automatic renewal of the Credit on May 20, 1996, Banco was required to provide 3Com with clear and unequivocal notice of non-renewal.

### 2. *The May 1996 Telex*

■ As noted above, the Credit itself provided that it "shall be automatically extended, without written amendment, in each successive calendar· year unless we [Banco] send to you [3Com, via Bank of America] written notice that we have elected not to renew the credit beyond [the expiry] date (a 'notice of termination')." Banco's May 1996 telex to Bank of America stated: "Please cancel [the Credit] and release us from liabilities . . . ."

The clearest notice of non-renewal would have tracked the language of the evergreen clause and stated: "We have elected not to renew the credit beyond May 20, 1996." However, the summary judgment record includes an uncontradicted Declaration of Carlos Augusto Maranhao, the

---

4. In arguing for the contrary position, Banco's reliance on *National Union Fire Ins. Co. v. Manufacturers Hanover Trust Co.,* 194 A.D.2d 327, 598 N.Y.S.2d 228 (1st Dep't 1993), is misplaced. The court in that case, without any discussion, applied UCC § 1–201(26) in deciding the issue of whether a party had taken sufficient steps to *deliver* a

notice of non-renewal of a letter of credit. The *content* of the notice was not at issue in the case, and the court's opinion makes no mention of whether the letter of credit at issue incorporated the UCP. Accordingly, *National Union* is not applicable to the issues presented here.

manager of Banco's Sao Paulo branch, which states that "it is common and normal for banks to use any of several similar words, including 'terminate,' 'cancel' and 'not renew' in such notices." (Maranhao Decl. ¶ 14.) Viewing this evidence in the light most favorable to Banco, we conclude that the May 1996 telex *could* have been construed as a notice of non-renewal.

Ambiguity arises, however, from the fact that the telex also could have been—and in fact, as the District Court found, most easily could have been—construed as a request for pre-expiry date consensual cancellation of the Credit. *See* 2 F.Supp.2d at 459. Maranhao's statement that the word "cancel" is "normally construed to terminate the L/C upon the date of its stated expiration," (Maranhao Decl. ¶ 14), is belied by the fact that Banco used the same word on three prior occasions when, undisputedly, it sought an immediate cancellation. As noted above, the telex to the advising bank on those occasions read: "Please obtain from beneficiary authorization to cancel [the Credit]."

Banco contends that the May 1996 telex could not reasonably be construed as another request for immediate cancellation because, unlike the earlier telexes, it does not seek 3Com's authorization, which was required for pre-expiry date cancellation but not for non-renewal. Nevertheless, Banco does not suggest that requests for immediate cancellation must include an explicit reference to the beneficiary's consent, and therefore the absence of such language did not preclude interpretation of the May 1996 telex as another such request. Moreover, the similarities between the May 1996 telex and the earlier telexes are at least as strong as this and any other differences between those communications. In addition to the similar use of the word "cancel" and the similar tone (that is, one of request rather than notice), the May 1996 telex, like the earlier telexes, did not refer to the May 20, 1996 expiry date, thereby suggesting that the telex was intended to have immediate effect.

In this connection, Banco also emphasizes that the May 1996 telex was sent shortly before the expiry date. However, the strong potential for drafts during this period—for example, 3Com's draft as late as May 9 of the following year—demonstrates that the telex could easily have been construed as a request for immediate cancellation even at such a late date. Banco appears to argue as well that 3Com, based upon its awareness that Banco desired pre-expiry date cancellation, should have inferred that Banco also would not want to renew the Credit beyond the expiry date. This argument ignores the fact that, regardless of its prior conduct, Banco was under an obligation to provide clear and unequivocal notice of non-renewal.

Perhaps most importantly, Banco itself effectively acknowledged the ambiguity of the May 1996 telex when it sent follow-up telexes in June and July stating: "Please consider our [May 13 telex] as a notice of termination and release us from liabilities." In the absence of a prompt response by Bank of America to the May telex, Banco evidently realized that the telex might have been construed as something other than a notice of non-renewal of the Credit.

In sum, we agree with the District Court that Banco's May 1996 telex did not provide clear and unequivocal notice of non-renewal. Nevertheless, Banco maintains that once the District Court had identified the existence of ambiguity in the telex, summary judgment should have been denied, with the result that the ambiguity would be resolved at trial.

■ It is often stated that the existence of ambiguity in contractual language is a "question of law" for the court, and the resolution of any such ambiguity is a "question of fact" for the jury. *See, e.g., Bouzo v. Citibank, N.A.,* 96 F.3d 51, 58 (2d Cir.1996). As with any other factual issue, however, the court may resolve ambiguity in contractual language as a matter "of law" if "the evidence presented about the parties' intended meaning [is] so one-sided

that no reasonable person could decide the contrary." *Boston Five Cents Sav. Bank v. Secretary of Dep't of Housing & Urban Dev.*, 768 F.2d 5, 8 (1st Cir.1985) (Breyer, J.).

Here, the material issue is not the resolution of ambiguity in contractual language, but whether Banco's May 1996 telex met the "clear and unequivocal" standard. This factual issue, therefore, was properly determined "as a matter of law" if a factfinder could not reasonably conclude that the standard was met. The District Court in this case so found, *see* 2 F.Supp.2d at 459, and, for the reasons stated above, we agree. Accordingly, we affirm summary judgment in favor of 3Com on this issue.

## B. *Fraud in the Transaction*

 As an alternative justification for dishonoring at least one of 3Com's drafts, Banco argues that there was "fraud in the transaction."[5] Although the UCP does not explicitly provide a "fraud in the transaction" defense, New York law makes the defense available to issuers of letters of credit that incorporate the UCP. *See Recon/Optical, Inc. v. Government of Israel*, 816 F.2d 854, 858 n. 4 (2d Cir.1987).

 The doctrine, however, authorizes dishonor only where "a drawdown would amount to an outright fraudulent practice by the beneficiary." *Id.* at 858 (internal quotation marks omitted). For example, if a draft is accompanied by documents evidencing shipment of goods under a contract of sale, the doctrine permits dishonor not where a legitimate dispute exists concerning whether the goods conform to the underlying contract, but only where the goods are so obviously defective that the representation of shipment is plainly false. *See, e.g., United Bank Ltd. v. Cambridge Sporting Goods Corp.*, 41 N.Y.2d 254, 256, 392 N.Y.S.2d 265, 360 N.E.2d 943 (1976) (seller "had shipped old, unpadded, ripped and mildewed gloves rather than the new gloves to be manufactured as agreed upon"); *Sztejn v. J. Henry Schroder Banking Corp.*, 177 Misc. 719, 720, 31 N.Y.S.2d 631 (1941) (beneficiary allegedly shipped not bristles contracted for but rather "cowhair, other worthless material and rubbish with intent to simulate genuine merchandise and defraud the plaintiff"). Similarly, if a draft is accompanied by a beneficiary's statement that the issuer's customer has materially breached the underlying contract, dishonor is permissible only where the beneficiary's claim of breach is clearly untenable. *See, e.g., Recon/Optical*, 816 F.2d at 858 (draft not fraudulent because "[w]hether or not [the beneficiary's] view of the merits of these disputes is correct, there is no evidence [of] bad faith"); *Ground Air Transfer, Inc. v. Westates Airlines, Inc.*, 899 F.2d 1269, 1272–73 (1st Cir.1990) (draft not fraudulent because claim of default at least "colorable"); *Roman Ceramics Corp. v. Peoples Nat'l Bank*, 714 F.2d 1207, 1214 (3d Cir.1983) (draft fraudulent where claim of nonpayment "has no basis in fact" and thus drawer "has no bona fide claim to payment at all").

In this case, it is undisputed that 3Com's drafts strictly complied with the terms of the Credit by including the statement that "[t]he amount of the draft which this statement accompanies will be applied by us to indebtedness due and owing by Comp Service Ltda for invoices which Comp Service Ltda defaulted on the payment terms to 3Com Corp." Banco contends only that these statements were fraudulent because the invoices at issue were in the name of, and for goods shipped to, Techtrade rather than Comp Service itself. As discussed above, however, (1) Techtrade was Comp Service's U.S. purchasing agent, (2) Techtrade had assumed the obligations of Expasa, which had been a party to the distributorship agreement with 3Com, and (3)

---

**5.** As noted above, Banco's notice of dishonor of the second draft referred only to the alleged expiration of the Credit.

Comp Service had unconditionally guaranteed payment of Techtrade's obligations to 3Com, and had waived any right to require 3Com to proceed against Techtrade rather than Comp Service directly.

Viewing these facts in the light most favorable to Banco, we conclude that a reasonable finding of "fraud in the transaction" could not be reached in this case. A legitimate dispute exists concerning the meaning of the required statement—that is, the statement is arguably ambiguous with respect to whether it contemplates invoices issued to a third party but for which Comp Service is liable. Consequently, 3Com's presentment of the statements under the circumstances was by no means an "outright fraudulent practice," *Recon/Optical,* 816 F.2d at 858, and we affirm summary judgment for 3Com on this issue.

### III. Conclusion

No reasonable factfinder could conclude, from the evidence in the summary judgment record, that Banco was entitled to dishonor 3Com's drafts either on the basis that the Credit had expired or on the basis that the drafts were fraudulent. Accordingly, we affirm the District Court's entry of summary judgment for 3Com on its claims against Banco for wrongful dishonor.