**EVOLUTION MARKETS, INC., Plaintiff,**

v.

**ALPENTAL ENERGY PARTNERS, LLC, Defendant.**

**No. 16–cv–1478 (CM)**

United States District Court, S.D. New York.

Signed 11/16/2016

David Brian Wechsler, Wechsler & Cohen, LLP, New York, NY, for Plaintiff.

Harold F. Damm, Ciotti & Damm, LLP, Mineola, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

McMahon, C.J.:

Evolution Markets, Inc. ("Evolution") and Alpental Energy Partners, LLC ("Alpental"), entered into a contract pursuant to which Evolution was to broker transactions in carbon emissions credits for Alpental in exchange for a fee. Evolution now sues Alpental, alleging that Alpental breached that contract by failing to pay the agreed-upon commission.

Alpental counterclaimed alleging that Evolution's filing suit for breach of contract in a court of law—as is its right under the Constitution and laws of this nation—itself constituted a breach of the contract, in that any agreement between them was "confidential" in nature and should have been filed under seal. Alpental also argues that it never authorized the transaction as to which no commissions were paid, so no commissions were owed.

Evolution is entitled to recovery. Under the clear and unambiguous provisions of the contract it signed, Alpental authorized the challenged transaction (hereinafter the "February 10 transaction") by failing to object to it within one day after receiving a written confirmation of the deal. Furthermore, it has repeatedly acknowledged its obligation to pay Evolution for brokering the deal. Therefore, Evolution is entitled to summary judgment on its claim for $157,553.13, with interest from the date of the breach, which was June 23, 2015.

Alpental's "counterclaim" is dismissed with prejudice. The documents filed as exhibits to the complaint include the contract on which the claim is predicated and documents generated in conjunction with the challenged transaction—all evidence germane to the claim in suit, none of which could ever be kept from the Court. There is a presumption of public access to documents filed in connection with judicial proceedings, which means that no litigant in a court of law has a right to keep evidence secret and no filing may be made under seal without the permission of the court. This Court is particularly hostile to efforts to litigate in secret and under seal and

would never have granted permission to file a simple brokerage contract, which contains no "trade secrets," under seal. If Alpental wanted to keep the terms of its contract confidential, then it should have abided by them and paid the money that was owed, so that Evolution did not have to resort to the courts to vindicate its undisputed and indisputable contractual right.

## BACKGROUND

The following facts are undisputed.

### The Brokerage Agreement

Evolution, a Delaware-organized corporation with a principal place of business in New York, is a commodities brokerage firm that arranges emissions transactions, including deals involving carbon emissions and offsets. Rule 56.1 Statement of Facts ¶¶ 1, 3, ECF No. 19 ("Pl.'s 56.1"). Lenny Hochschild is a Managing Director at Evolution. Hochschild Decl. to Pl.'s Mot. for Summ. J. ¶ 1, ECF No. 17-1 ("Hochschild Decl.").

Alpental is a Utah limited liability company that principally does business in Utah. Rule 56.1 Statement ¶ 2. Brady Olson is a manager at Alpental. Olson Decl. to Def.'s Opp'n ¶ 2, ECF No. 21 ("Olson Decl.").

On February 23, 2011, Alpental engaged Evolution as its exclusive broker for emissions credits (the "Brokerage Agreement"). Pl.'s 56.1 ¶¶ 4–5; Def.'s Resp. to Pl.'s 56.1 ¶¶ 4–5, ECF No. 20 ("Def.'s Resp. 56.1"). The Brokerage Agreement, which is attached to the complaint as Exhibit A, contains the following information: the names of the parties, the purpose of the agreement, an outline of the duties to be performed by Evolution at Alpental's direction, an exclusivity clause, directions for filing confirmations, and a clause obligating Evolution to provide market information relating to emissions credits to Alpental at the latter's request. It outlines the parties' agreement concerning Evolution's compensation, allocates risk as between the parties, contains representations and warranties by Evolution concerning its ability to perform, and addresses to which notices should be filed. There is an assignment and waiver clause, a provision concerning termination, breach and cure, and the governing law is that of New York. There are in the three-page Agreement no secret formulas, customer lists, or any other information that could arguably be considered confidential business information, other than the fact that it was made.

The agreement contains two provisions that are integral to this lawsuit.

The first is found in Clause 3, which explains how the deals are to be done. Alpental directs Evolution about the terms on which it would be willing to transact in emissions credits, and Evolution may then approach potential counterparties. Should there be an acceptance of Alpental's terms, Evolution may close the deal on a recorded call, but must provide written transaction confirmation to Alpental immediately thereafter. The agreement then clearly states, "CLIENT [Alpental] shall notify EVOLUTION with one (1) business day after receipt of the Confirmation of any disagreement with the terms set forth therein. This Agreement and the Confirmation shall comprise the terms and conditions of the transaction. In the event of a discrepancy between this Agreement and the Confirmation, the Confirmation shall govern." Pl.'s 56.1 ¶ 6; Def.'s Resp. 56.1 ¶ 6; see also Hochschild Decl. ¶ 4, Ex. A ¶ 3.

The second provision of relevance is Clause 9, the confidentiality provision. It states: "The parties acknowledge that the existence and substance of this Agreement, and all subsequent transactions re-

lating to the Emissions Credits, as well as other information disclosed between the parties, are confidential and shall not be disclosed to any other party except pursuant to administrative regulation or judicial order." Pl.'s 56.1 ¶ 6; Def.'s Resp. 56.1 ¶ 6; *see also* Hochschild Decl. ¶ 4, Ex. A ¶ 9.

In exchange for Evolution's brokering the sale, purchase, or exchange of emissions credits, Alpental agreed to pay Evolution a commission worth 2.5% the value of the transaction. Pl.'s 56.1 ¶¶ 5–6; Def.'s Resp. 56.1 ¶¶ 5–6. The parties agreed that forty percent of Evolution's commission would be due and payable at the time Alpental entered into an emission credit purchase or sale agreement with its counterparty, and the remaining sixty percent of the commission would be paid when the first emission credit was issued. *Id.* Neither Evolution nor Alpental contests the existence of the Amendment or the nature of its terms.

The parties further agreed that any dispute arising from the Brokerage Agreement would be "governed by and construed in accordance with the laws of the State of New York," and further, that "Each party hereby submits to the jurisdiction of the state and federal courts located In New York City, Borough of Manhattan." Hochschild Decl. ¶ 4, Ex. A at ¶ 14.

### The First Emissions Deal

On October 25, 2011, Evolution brokered a sale of emission credits between Alpental and an entity called CE2 California III LLC ("CE2"). Pl.'s 56.1 ¶ 7; Def.'s Resp. 56.1 ¶ 7. Evolution is not asserting a claim with respect to this transaction, which seems to have fallen apart, in any event. However, the dispute over its commission is an integral part of Plaintiff's claim for failure to pay commissions in connection with a subsequent deal, discussed *infra*.

In the CE2 transaction, Alpental agreed to transfer to CE2 a fixed number of emission credits from 2012 through 2019. Evolution asserts that its commission on this transaction totaled $141,775, of which forty percent ($56,710) was due within thirty days of Alpental and CE2's entering into contract, and the remaining sixty percent ($85,065) upon the first issuance of the emission credits. Pl.'s 56.1 ¶¶ 9–10. Alpental disagrees that Evolution was entitled to any commission from the CE2 transaction. Def.'s Resp. 56.1 ¶¶ 9–10. Although neither party makes clear whether Alpental in fact paid the initial $56,710 on the CE2 deal, although it would seem that it was paid, since Evolution complains only that "Evolution defaulted in paying the $85,065 commission balance" on the CE2 transaction. Pl.'s 56.1 ¶ 11.

Evolution has not provided any documentary support for the CE2 transaction, and Alpental denies that Evolution earned any commission from the CE2 transaction or that it defaulted on the CE2 transaction, Def.'s Resp. 56.1 ¶¶ 9–10. But Alpental does not dispute the fact that it entered into a later agreement that explicitly ratified the CE2 transaction and its terms, including the $85,065 amount due. *See* Hochschild Decl. ¶ 9, Ex. C at 1 (directly referencing the CE2 transaction and the amount owed to Evolution); *see also* discussion *infra*. Alpental cannot manufacture a genuine dispute of fact by denying the terms of the CE2 transaction while essentially conceding the very facts that validate the CE2 transaction and confirm the commission amount that Evolution earned.

### The Amendment to the Brokerage Agreement

After the breakdown of relations over the CE2 deal, the parties agreed to enter into a Commission Payment Agreement and Amendment (the "Amendment"), dated February 5, 2015. Pl.'s 56.1 ¶ 11; Def.'s

Resp. 56.1 ¶ 11; Hochschild Decl. ¶ 9, Ex. C.

The Amendment incorporated by reference all the terms of the Brokerage Agreement, including the provisions discussed above. Hochschild Decl. ¶ 9, Ex. C. It expressly provided that Evolution would extend Alpental's time to pay $85,065 of the remaining CE2 transaction payment to no later than December 31, 2016, as long as Alpental paid it $50,000 by March 31, 2015. *Id.* ¶ 11. By signing this Amendment, Alpental acknowledged that it owed Evolution $85,065 on the prior CE2 transaction.

Apparently the parties believed that the CE2 transaction might not go forward, because they made an express provision for what would happen if the deal fell apart (as it eventually did). In the event that the CE2 transaction was cancelled on or before June 30, 2015, Alpental agreed to appoint Evolution as its exclusive agent to re-sell the emission credits that had been the subject of the cancelled CE2 transaction. The agreement to re-sell the emission credits was subject to the commission arrangement outlined in the original Brokerage Agreement—Evolution would take a commission of 2.5% the value of the transaction, forty percent of which was due and payable within thirty days of entering into contract, and sixty percent of which was due and payable when the first emission credits issued. To take account of the fact that the CE2 deal had been cancelled, the Amendment provided that Evolution would: (i) credit Alpental's $50,000 payment (the one that was to be made by March 31, 2015) against any future commission that Evolution earned for re-selling those same emission credits; and (ii) forgive the $35,065 balance owed on the cancelled CE2 transaction. Hochschild Decl. ¶ 9, Ex. C.

The CE2 transaction was terminated on some unspecified date between February 5, 2015 (the date of the Amendment) and February 10, 2015. Pl.'s 56.1 ¶ 17; Def.'s Resp. 56.1 ¶ 17. This event triggered the agreement by Alpental to appoint Evolution as its exclusive agent to re-sell the emission credits, and the corresponding agreement by Evolution to credit Alpental's $50,000 payment against future commissions and to forgive the $35,065 balance. Hochschild Decl. ¶ 15; Def.'s Resp. 56.1 ¶ 18. As of the date that the CE2 transaction was cancelled, Alpental had not made any additional payments to Evolution.

### The February 10 Transaction

On February 10, 2015, Evolution entered into an agreement on Alpental's behalf with another customer to re-sell "the Emission Credits that would have otherwise been sold to CE2. Hochschild Decl. ¶ 9, Ex. C at 1; Pl.'s 56.1 ¶ 18; Def.'s Resp. 56.1 ¶ 18. The deal was valued at $8,302,125. Hochschild Decl. ¶ 15, Ex. D at 1. The February 10 transaction is the subject of his lawsuit. Pl.'s 56.1 ¶ 18; Def.'s Resp. 56.1 ¶ 18.

Also on February 10, Evolution sent Alpental written confirmation of the February 10 transaction. Pl.'s 56. 1 ¶ 19; Def.'s Resp. 56.1 ¶ 19. Alpental did not object to its terms within one (1) business day, as the Brokerage Agreement and Amendment required. Pl.'s 56.1 ¶ 20; Def.'s Resp. 56.1 ¶ 20. Since the transaction was not objected to, it was authorized. Evolution stood to earn a commission of $207,533.12 for brokering the February 10 transaction.

The February 10 transaction also set in motion the payment provisions in the Brokerage Agreement and Amendment. *See* Hochschild Decl. ¶ 19, Exs. C–D at 20. Alpental had not yet paid $50,000 toward the remaining balance on the CE2 transaction, but it was obligated, under the Amendment, to make that payment—and

because the CE2 Transaction had been cancelled, Evolution was required to credit that payment against the $207,533.12 commission from the February 10 transaction. Once that payment was made (assuming it was made prior to March 31, 2015), Evolution was required to forgive the $35,065 in commission that remained due on the cancelled CE2 transaction. But Alpental did not pay the $50,000 by March 31, 2015; it did not make that payment until August 21, 2015. Pl.'s 56.1 ¶ 32; Def.'s Resp. 56.1 ¶ 32.

Nonetheless, Evolution chose to credit Alpental's $50,000 payment against the $207,533.12 commission, and it forgave the $35,065 that remained due on the cancelled CE2 transaction. Pl.'s 56.1 ¶ 33; Def.'s Resp. 56.1 ¶ 33. That brought the total owed to Evolution in commissions on the February 10 transaction down to $157,553.13, Pl.'s 56.1 ¶ 33, which became due on June 23, 2015, when the emissions credits were first issued. Hochschild Dec. ¶ 32, Ex. H at Evolution0031. That sum has never been paid and Evolution here sues for breach of contract to recover that sum. Pl.'s 56.1 ¶ 20; *see* Def.'s Resp. 56.1 ¶ 34.

Alpental denies that it owes Evolution $157,553.13 or any money at all. It claims that the February 10 transaction was unauthorized, because it never expressly consented to, affirmed, or agreed to the deal—ignoring the fact that the Brokerage Agreement makes the deal binding as long as Alpental fails to object to the terms outlined in the written confirmation. It also objects to Evolution's calculation of the amount owed though it does not explain what mathematical errors it sees in a simple percentage calculation that looks right to the Court. *See* Olson Decl. ¶¶ 3–5.

### Payment Requests and Attempts at Resolution

Evolution states—and Alpental does not dispute—that it repeatedly and frequently contacted Alpental to pay the $157,553.13 balance. Pl.'s 56.1 ¶ 25; Def.'s Resp. 56.1 ¶ 25. For example, on August 12, 2015, Evolution's Lenny Hochschild wrote to Alpental's Brady Olson: "As you know, we have been awaiting payment from you since March and this lack of payment has now become a problem—can you please let me know when I can call you to discuss this matter." Hochschild Decl. ¶ 23, Ex. E. Olson responded, "I have received approval from our lender to make a payment. I am working on finalizing the amount. The Payment will go out next Tuesday. I'm sorry I am doing everything I can given the circumstances with the project." *Id.* ¶ 24, Ex. E.

Evolution argues that this response—along with Alpental's responses to Evolution's subsequent requests for payment—acknowledged and confirmed the existence of its outstanding payment obligation. Pl.'s 56.1 ¶¶ 34, 40, 44, 48. Throughout the course of these communications, never once did Alpental dispute or deny the existence or amount of its debt to Evolution.

By November 2015, the $157,553.13 balance remained unpaid. Evolution informed Alpental that it had forwarded the matter to its legal team. *Id.* ¶ 43. Alpental wrote to Evolution that it was taking action on its end so that it could "continue making payments," adding that Evolution's "invoice is on the list of invoices we want to take care of . . . . I understand if you need to hand it over to legal at this point. I'm doing everything I can do." Hochschild Decl. ¶ 35, Ex. H at Evolution0029.

Still, the parties tried to establish a payment plan. Pl.'s 56.1 ¶¶ 53–55, 58–60. Alpental offered to pay Evolution over time by paying "$10,000 by the end of this week," "$50,000 in February 2016," and the "balance by June 2016." Zeliger Decl.

in Supp. of Pl.'s Mot. for Summ. J. ¶ 10 ("Zeliger Decl."), ECF No. 17–12, Ex. N at Evolution0065. Evolution's General Counsel, Benjamin Zeliger, responded:

> Last week you told me that you thought you could pay us $50,000 by the end of last week. And also that we could work out a monthly payment plan for the rest. Your proposal below is materially different from what you said on the phone.

*Id.* ¶ 11, Ex. N at Evolution0064. Nonetheless, Zeliger said that he would accept Alpental's proposal subject to Alpental's (i) signing an agreement incorporating the payment schedule; and (ii) providing a confession of judgment. *Id.* ¶ 12, Ex. N at Evolution0064.

On December 10, 2015, Zeliger sent Alpental a draft agreement and a confession of judgment. *Id.* ¶ 12, Exs. N–O. Alpental did not execute the draft agreement or a confession of judgment. Once again, the parties continued to attempt to work out a payment schedule. These efforts were fruitless, and Evolution never received the $157,553.13 Alpental owes it. *Id.* ¶ 63.

### Alleged Breach by Evolution

Alpental reasons that it has no payment obligation because Evolution materially breached its contractual duty of confidentiality by disclosing Alpental's sensitive business information in the complaint and in summary judgment filings before this Court. Def.'s Resp. 56.1 ¶¶ 5–8. On this theory, Alpental has brought a counterclaim against Evolution for breach of contract.

Evolution moved for summary judgment on its claims for breach of contract and account stated, and it further urges this Court to summarily dismiss Alpental's counterclaim for breach of contract. Alpental, of course, opposes Evolution's motion and otherwise urges that genuine disputes of material fact persist so as to make summary judgment inappropriate.

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A dispute concerning material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505.

To defeat summary judgment, it is not sufficient for the non-moving party to present evidence that is conclusory or speculative, with no basis in fact. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Indeed, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Beard v. Banks,* 548 U.S. 521, 529, 126 S.Ct. 2572, 165 L.Ed.2d 697

(2006). "Summary judgment is designed ... to flush out those cases that are predestined to result in directed verdict." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

 A court's primary objective in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement. *See Compagnie Financiere De Cic Et De L'UNION Europeenne, Mgmt. Investment Funding Ltd. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157–58 (2d Cir. 2000). Yet summary judgment is proper in a contract dispute only if the language of the contract is wholly unambiguous. *See id.* (citing *Mellon Bank v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir. 1994)). Whether a contract is ambiguous is a question of law for the court to decide. *See id.* While interpretation of ambiguous contract language generally is a question of fact to be resolved by the factfinder, "the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide to the contrary." *Id.* (quoting *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746–47 (2d Cir. 1999)).

Here, neither party argues that the language of the Brokerage Agreement or Amendment is ambiguous, and the Court has no independent reason to reach that conclusion. Accordingly, the Court can and will decide Evolution's motion based on the record as it now stands.

## II. Applicable Legal Standards

### A. *Summary Judgment Motion on Evolution's Breach of Contract Claim*

Evolution asserts that it is entitled to summary judgment on the first count of its complaint, which charges Alpental with breach of contract for its failure to pay Evolution the $157,553.13 balance due from the February 10 transaction. The crucial questions are these: is there a material dispute of facts as to whether Alpental's non-payment constituted a material breach, and does Evolution's alleged subsequent breach impact Alpental's liability for Alpental's earlier breach.

### 1. Alpental Breached the Contract

 A plaintiff must prove four elements to prevail on a breach of contract claim: (1)the making of a contract; (2) plaintiff's performance; (3) defendant's breach; and (4) damages. *National Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

 Alpental argues that it never agreed to enter into the February 10 transaction, so it does not owe Evolution a commission on the February 10 transaction. But Alpental is wrong. Its agreement to be bound by the February 10 transaction is apparent from the unambiguous and undisputed terms of the Brokerage Agreement and Amendment.

The Brokerage Agreement provides that "EVOLUTION shall sell, purchase or exchange Emission Credits on CLIENT'S [Alpental's] Directions and only upon CLIENT'S [Alpental's] Directions and otherwise pursuant to the terms and conditions set forth in this Agreement." Hochschild Decl. ¶ 3, Ex. A ¶ 1. This means that Evolution could enter into agreements on Alpental's behalf only if Alpental directed it to do so. Alpental does not allege that Evolution breached this specific contract provision, and Alpental neither references nor offers any evidence suggesting that Evolution was, in fact, in breach of that provision.

The Brokerage Agreement contains a failsafe to ensure that Evolution would act

only upon Alpental's directions. The Brokerage Agreement provides that:

> CLIENT [Alpental] will instruct EVOLUTION regarding the terms and conditions under which it wishes to transact, and EVOLUTION will communicate these terms and conditions to potential counterparties. At such time as CLIENT [Alpental] and counterparty agree upon the terms of a transaction, EVOLUTION will orally close the transaction via recorded telephone lines and follow this with a written transaction confirmation (the "Confirmation"). The Confirmation will include the following: transaction type/product; transaction date; price; quantity; term; delivery; settlement; commission; and counterparty. CLIENT [Alpental] shall notify EVOLUTION within one (1) business day after receipt of the Confirmation of any disagreement with the terms set forth therein."

*Id.* Ex. A ¶ 3. This provision is also incorporated by reference into the Amendment.

Alpental contends that it never affirmatively consented to the February 10 transaction confirmation. But the plain and undisputed terms of the Brokerage Agreement, as incorporated by reference into the Amendment, required that Alpental inform Evolution of any disagreement with a transaction confirmation within twenty-four hours of receiving a transaction confirmation. After receiving confirmation of a successfully brokered transaction, the onus was on Alpental to *object*, not to consent. Nowhere, and at no time, does Alpental argue that it did not receive the confirmation of the February 10 transaction, and Alpental offers no evidence that it timely objected to the deed. Alpental otherwise concedes the facts necessary to establish that the February 10 transaction brought about a contract between Alpental and Evolution.

The Brokerage Agreement and Amendment impose upon Alpental payment obligations once Evolution fulfilled its parts of the bargain. Hence, when Evolution brokered a deal on Alpental's behalf on February 10 to which Alpental did not object, Alpental's return performance (in the form of partial payment) also became required. And when the emission credits were first issued on the February 10 transaction, that return performance came fully due.

There is no genuine dispute of material fact as to whether the February 10 transaction was authorized pursuant to the Brokerage Agreement and the Amendment, triggering payment obligations for Alpental. Insofar as Alpental concedes that it did not pay Evolution the commission that arose from the February 10 transaction, Alpental is in breach of its contract.

### 2. Evolution's Filings Did Not Diminish Alpental's Breach

■ Alpental argues that it is not liable for breach of contract because Evolution committed a subsequent breach of contract when it filed this lawsuit without doing so under seal. This, according to Alpental, breached the confidentiality clause of the Brokerage Agreement.

There are two problems with Alpental's argument.

■ First, a subsequent breach by Party B to a contract does not excuse a prior breach by Party A. That is not the way the law works. In New York, one party's obligation to perform under a contract is excused only when the other party repudiates the contract or when the contract becomes impracticable or impossible, or when it becomes apparent that the contract was the product of a mutual mistake. *See Camp Kennybrook Inc. v. Kuller*, 214 A.D.2d 264, 266, 632 N.Y.S.2d 874, 875 (1995). Moreover, a non-breaching party's contractual obligation to further perform

on the contract will be excused if "the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997). However, there is no authority whatever for the proposition that Party A's blatant breach of contract is excused if Party B breaches the contract <u>after</u> Party A does so; one looks to the situation at the time of Alpental's breach. At that moment, Evolution had done nothing at all to breach the contract, so there was no justification for Alpental to do so. A subsequent breach by Evolution might offset any damages suffered from Alpental's earlier breach, but it does not excuse Alpental's prior behavior.

 Second, in this case, there was no actionable breach by Evolution. The Brokerage Agreement bound Evolution to keep the existence and the terms of the contract confidential, but it also explicitly permitted Evolution to file an action in a court of law to enforce its rights under that contract. Such an action would require Evolution to provide the Court with access to the contract itself. Court cases are presumptively filed publicly, not under seal; indeed, there is a presumptive right of access by the public to "judicial documents" that directly affect courts' adjudication of issues. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 (2d Cir. 2006). Even if Evolution had tried to file its complaint or the contract under seal, that filing would have been rejected by the Clerk absent an order from the presiding judge permitting the matter to be filed under seal. *See* S.D.N.Y. Electronic Case Filing Rules & Instructions § 6; Judge Colleen McMahon, Individual Practices and Procedures Part IV.I (Sept. 4, 2015). There was no guarantee that Evolution could obtain such an order from this or any other judge of this Court. So it can hardly be said that Alpental had a right to one. Not only was the matter entirely out of Evolution's hands, but a reading of the contract at issue—which contains no secret formulas, customer lists, or other information that could even arguably be called a "trade secret"—reveals how unlikely it was that any court (and certainly this Court) would permit the case to be litigated in secret.[1]

Of course, Evolution did not seek the Court's permission to file the case under seal, and perhaps Alpental means to assign that failure as the breach of contract by Plaintiff. However, damages is an element of breach of contract, *National Mkt. Share*, 392 F.3d at 525, and since there was no way the contract could bind the Court to enter a sealing order, Alpental cannot identify any damages that it suffered as a result of Evolution's failure to seek said order. The matter of sealing was ultimately out of Evolution's hands; it rested entirely in the discretion of the Court. Alpental cannot prove that it suffered any damages from Evolution's failure to seek a sealing order unless it first proves that this Court would have allowed the case to proceed under seal. It cannot surmount that particular hurdle.

Therefore, Alpental has no defense to Evolution's motion for summary judgment and Evolution is entitled to prevail on that motion for summary judgment.

---

1. My individual rules require parties to include an addendum to any proposed stipulation and confidentiality order. Judge Colleen McMahon, Individual Practices and Procedures Part IV.I (Sept. 4, 2015). This addendum makes clear that I am deeply skeptical of secrecy claims in commercial litigation, and this particular claim of secrecy proves my skepticism is not unfounded.

**372**

### B. Summary Judgment on Evolution's Account Stated Claim

 Evolution also seeks summary judgment on an account stated. "An account stated is an agreement between parties to an account based upon prior transactions between them with respect to the correctness of the account items and balance due." *Jim–Mar Corp. v. Aquatic Constr.*, 195 A.D.2d 868, 869, 600 N.Y.S.2d 790, 791 (N.Y. App. Div. 1993).

 To establish a claim for an account stated, the plaintiff must offer proof that the defendant received the bill. *Morrison Cohen Singer & Weinstein, LLP v. Brophy*, 19 A.D.3d 161, 798 N.Y.S.2d 379, 380 (1st Dept. 2005). Unrebutted documentary proof attached as exhibits to Evolution's moving papers establishes that Evolution billed manager Brady Olson, Zeliger Decl. ¶ 2, Ex. K, who was listed as Alpental's point of contact in the Brokerage Agreement, Hochschild Decl. ¶ 3, Ex. A ¶ 10. Alpental does not deny that it received the invoices, emails, or calls requesting payment. Def.'s Resp. 56.1 ¶ 25. It simply states that the documents say what they say, and should not be construed to mean that Alpental owes Evolution any money. Even if this declaration could be considered a denial of receipt of all of the bills, an unsupported denial, without anything more is insufficient to raise any issue of fact so as to defeat a motion for summary judgment on an account stated. *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff*, 638 F.Supp. 714, 720–21 (S.D.N.Y. 1986).

 Alpental argues that the complaint fails to state a claim on an account stated theory because Alpental never expressly acknowledged the final statement of account relied upon by Alpental or expressly evinced its intent to pay without objection. However, lack of an express objection to an account stated is insufficient to defeat a motion for summary judgment. *Lockwood v. Thorne*, 11 N.Y. 170, 173–74 (1854); *see also Meadowbrook–Richman, Inc. v. Associated Fin. Corp.*, 325 F.Supp.2d 341, 360 (S.D.N.Y. 2005) (quoting *Lockwood*). Under New York and federal laws, "an agreement to pay an indebtedness may be implied if a party receiving a statement of account keeps it without objecting to it within a reasonable amount of time unless fraud, mistake or other equitable considerations are shown." *Lankler Siffert & Wohl, LLP v. Rossi*, 287 F.Supp.2d 398, 407 (S.D.N.Y. 2003) (quoting *Kramer*, 638 F.Supp. at 719); *see also AFL Fresh & Frozen Fruits & Vegetables, Inc. v. De–Mar Food Servs. Inc.*, No. 06–cv–2142, 2007 WL 4302514, at *3 n.3 (S.D.N.Y. Dec. 7, 2007).

The record in this case reflects that, on November 23, 2015, Evolution sent Alpental an invoice for the unpaid transaction commission. Zeliger Decl. ¶ 2, Ex. K. Alpental did not object at any time. Pl.'s 56.1 ¶ 20; *see* Def.'s Resp. 56.1 ¶ 20. In December 2015, Alpental did not dispute the $157,553.13 balance shown due on the draft settlement agreement and confession of judgment that Evolution provided on December 17, 2015. *See* Zeliger Decl. ¶ 13; Def.'s Resp. 56.1 ¶¶ 56–57. It simply did not sign those documents.

Three weeks later, Alpental asked Evolution if it would consider any other settlement terms, but did not assert that the balance was not owed or incorrectly calculated. Zeliger Decl. ¶ 14, Ex. N at Evolution0063. Records of the parties' subsequent indicate that Alpental acknowledged its indebtedness. For example, Alpental did not contest its $157,553.13 debt to Evolution in response to Hochschild's October 5, 2015 email or his October 30, 2015 email. Instead, Olson responded, that "your invoice is on the list of invoices we want to take care of." Hochschild Decl. ¶ 35, Ex. H

at Evolution0029. By failing to contest its debt, Alpental implied its assent of the $157,553.13 transaction commission due Evolution.

■ Moreover, an agreement to pay an indebtedness may also be implied if the debtor makes partial payment. *Kramer*, 638 F.Supp. at 720. The partial payment is considered acknowledgment of the validity of the account. *Id.* (citing *Parker Chapin Flattau & Klimpl v. Daelen Corp.*, 59 A.D.2d 375, 378, 399 N.Y.S.2d 222, 224 (1st Dep't 1977)). Here, Alpental concedes that it made partial payment to Evolution. Pl.'s 56.1 ¶ 32; Def.'s Resp. 56.1 ¶ 32. Alpental denies that this payment was intended to partially satisfy payment on the February 10 transaction, but it provides no evidence supporting any other explanation for the payment. Evolution's explanation—that the February 10 transaction was an authorized transaction and that the $50,000 was in partial satisfaction of it—*is* supported by the record.

Alpental argues that summary judgment on Evolution's account stated claim is improper because it disputes the amount owed to Evolution. This is a misstatement of its own argument. Alpental does not contend that Evolution's invoices contain accounting errors or mathematical typos. It instead argues that it owes Evolution *nothing* on the February 10 transaction. But this Court rejected that argument when it granted summary judgment on Evolution's breach of contract claim earlier in this opinion.

Accordingly, Evolution is entitled to summary judgment on its claim for account stated.

C. *Summary Judgment on Alpental's Counterclaim for Breach of Contract*

■ Alpental has brought a counterclaim based on Evolution's purported breach of the contract's confidentiality clause. Evolution has moved for summary judgment dismissing Alpental's counterclaim. For the reasons discussed above, that motion must be granted.

Even assuming that Evolution's failure to try to file under seal constituted a breach, Alpental cannot prove damages because there is no way to prove that this Court would have allowed Evolution to file the complaint under seal. Since the text of the contract does not contain any sort of information that normally qualifies as a trade secret or that is otherwise entitled to protection from public disclosure in a court of law—and since Alpental did not itself seek to mitigate any "damage" it was suffering by asking the court to seal Evolution's complaint, either when it filed its answer or at any time thereafter—Alpental would be hard pressed to establish that this or any court would have permitted the case to be litigated under seal. It certainly offers no such evidence in opposition to Evolution's motion for summary judgment dismissing the counterclaim. Therefore, it has failed to raise a genuine issue of fact that it suffered any cognizable damages from evolution's failure to do the only thing it could have done—make application to the Court for an order allowing it to file under seal.

Evolution's motion for summary judgment on Alpental's counterclaim is granted.

**CONCLUSION**

For the reasons stated above, Evolution's motion for summary judgment on its breach of contract and account stated claims are GRANTED. Evolution's motion for summary judgment to dismiss Alpental's counterclaim for breach of contract is also GRANTED.

This opinion resolves item number 16 on the docket.